## POOL v. POOL, AS ADMINISTRATOR.
### (No. 728.)

Estates of Decedents—Claims Against Estate—Services of Son During Decedent's Lifetime—Contract For—Failure of Decedent to Perform—Recovery of Value of Services Upon the Quantum Meruit.

1. In an action against an administrator by a son of the decedent upon a claim for work and labor performed during the father's lifetime and at his request, *held*, that the evidence stated showed an intention on the part of the deceased and an understanding between him and his son, the plaintiff, that the latter should be compensated for his services, and that the services were rendered in pursuance of such understanding, rendering it sufficient to support a verdict in plaintiff's favor.

2. Where a father agreed to give his son practically all of his property at the time of his death in consideration for his services in working upon and caring for the farm owned by the father, and upon which he resided, and failed to do so because of the loss or destruction of a will making the agreed disposition of his property, *held*, that the value of the son's services rendered under the contract could be recovered upon the *quantum meruit* in an action against the administrator of his father's estate.

3. The petition alleging the understanding between the father and son, the performance of the services, the value thereof, and the loss or destruction of a will made by the father devising practically all his property to the plaintiff, was sufficient to permit proof of the reasonable value of the plaintiff's services, and sufficient to state a cause of action.
[Decided June 30, 1913.]                    (133 Pac. 372.)

ERROR to the District Court, Johnson County; HON. CARROLL H. PARMELEE, Judge.

The material facts are stated in the opinion.

*Metz & Sackett,* for plaintiff in error.

Failing to allege any specific promise of the decedent to pay the plaintiff for his services, the petition is insufficient. Where one performs services for another, living in and as one of the family of the latter, being provided with food, clothing, lodging and care as one of the family, and there is no contract relating or providing for compensation for the services, no action can be maintained therefor. (Hay v. Peterson, 6 Wyo. 419.) There should have been a verdict for the defendant, for the evidence fails to show any contract. A son cannot recover for services performed on his father's farm while residing with and making his father's home his own home, without a specific agreement and promise to pay him wages. The jury were instructed that no specific promise was necessary, but that a mere intention, or an implication of an intention on the part of the father that the son should receive some compensation was all that was necessary to bind the father's estate. This is not the law. (Robinson v. Cushman, 2 Denio, 149; McGarvey v. Roods, 35 N. W. 488; Hinkle v. Sage (Ohio), 65 N. E. 999; Bash v. Bash, 9 Pa. 260; Duffey v. Duffey, 42 Pa. 399; Zimmerman v. Zimmerman, 129 Pa. 227, 15 Am. St. 720, 18 Atl. 129; Hall v. Finch, 29 Wis. 278, 9 Am. St. 559; Schmidt's Est., 93 Wis. 120, 67 N. W. 37; Coller v. Patterson, 137 Ill. 403, 24 N. E. 604; Desbrow v. Durand, 54 N. J. L. 343, 24 Atl. 545, 33 Am. St. 678; Wood on Mast. & Servt., Secs. 72, 75; Thorpe v. Patterson, 37 Mich. 68; James v. Gillen

(Ind.), 30 N. E. 9; Starkey v. Perry, 71 Cal. 495, 12 Pac.
508; Gerber v. Baurline, 19 Pac. 849; Mobley v. Webb, 3
So. 812; Daubson v. Austin, 9 Pa. St. 309; Barhite's App.,
126 Pa. St. 404, 17 Atl. 617; Ryan v. Lynch, 9 Mo. App.
18; Williams v. Williams, 132 Mass. 304; Smith v. John-
son, 45 Ia. 308; Wyley v. Bull, 41 Kan. 206, 20 Pac. 855.)

*Enterline & LaFleiche,* for defendant in error.

Although the plaintiff below was a son of the decedent,
he was not a member of his family during the period for
which he claims compensation for his services, in the sense
in which that term is employed in the cases cited by oppos-
ing counsel. This case is not like Hay v. Peterson, 6 Wyo.
419. Ample evidence was introduced in this case to sustain
the verdict. There is overwhelming testimony to the effect
that the deceased had promised to compensate his son by
giving him all of his property. The case is narrowed down
to the question whether the recovery was proper upon a
*quantum meruit.* We think clearly that the question is to
be answered in the affirmative. (Norton's Est. v. McAllis-
ter, 123 Pac. 963.) The decedent having agreed to com-
pensate his son in the manner suggested, the contract could
not be avoided even though he destroyed the will which he
made devising the property to the son. By the instructions
the issue was squarely submitted whether or not there was
an intention on the part of the decedent and the plaintiff
that the labor of the latter and money expended by him
should be paid for. The jury was properly instructed in
that respect, and must have found such an intention to have
existed. The fact that the decedent made a will in favor of
his son tends to rebut the presumption that the latter was
working for his father gratuitously. (Loper v. Sheldon's
Est. (Wis.), 97 N. W. 524; 35 N. W. 496 (Iowa); Ridler
v. Ridler (Ia.), 72 N. W. 671; Winkler v. Killian (N. C.),
54 S. E. 540; Williams v. Barnes, 14 N. C. 348; Parker v.
Parker, 33 Ala. 459; Steel v. Steel, 12 Pa. 64; Page on
Contracts, 778-782; Hokler v. Van Slambrook (Mich.), 86
N. W. 402; Fry v. Fry, 94 S. W. 990; App. of Huntington,

73 Conn. 582, 48 Atl. 766; Nelson v. Masterton, 2 Ind. App. 524, 28 N. E. 731; Purviance v. Shultz, 16 Ind. App. 94; Griffith v. Robertson, 73 Kan. 666, 85 Pac. 748; McGuire v. McGuire, 74 Ky. (11 Bush.) 142; Williams Est., 106 Mich. 490, 64 N. W. 490; Shane v. Shearsmith's Est., 137 Mich. 32, 100 N. W. 123; Cullen v. Wolverton, 65 N. J. L. 279, 47 Atl. 626; Gall v. Gall, 27 App. Div. (N. Y.) 173, 50 N. Y. Supp. 563; Leahy v. Campbell, 77 App. Div. (N. Y.) 127, 75 N. Y. Supp. 72; In re Wescott, 34 App. Div. (N. Y.) 239, 54 N. Y. Supp. 545; Bair v. Hager, 90 N. Y. Supp. 27; In re Funk's Est., 98 N. Y. Supp. 934, 49 Misc. Rep. 199; Waddell v. Waddell, 42 'S. W. 46.) The above cases fully sustain the right of the son in this case to recover.

SCOTT, CHIEF JUSTICE.

It is alleged in the petition filed in the court below and the evidence adduced upon the trial tends to show that Daniel J. Pool died intestate on October 3, 1911, and that during his life time he owned and resided on a farm in Johnson County, Wyoming, which he sold in August, 1910, receiving therefor $6,000, and removed to California. He had raised a family of children, all of whom were adults and all of whom had departed from the parental roof and were in business for themselves. Becoming old and by reason of the infirmity of age, he solicited his son, W. B. Pool, the defendant in error, to give up his business in Sheridan County in 1903 and come and work for him on the farm and relieve his father and mother, both of whom are now deceased, the wife and mother having died first on or about January 7, 1910, of the duties and cares of conducting the farm in pursuance of a contract between them that if his son would come and work upon the place and take care of the father and mother during their lifetime that the father would pay him by giving him all the property he had at his death. Such offer had been made to other members of his family, but had been refused. The defendant in error gave up his business, returned and brought with him some

money of his own, which he expended in improvements on the farm, and worked upon the farm and continued to do so up to one year prior to the time of the decease of his father, when the farm was sold, appropriating, as it is alleged, the proceeds of the farm or the rent received therefrom during the last few years prior to his father's death, and caring for his father and mother during that time, and up to the time his father died. The father made a will devising all of his property to the defendant in error, with the exception of $25 to each of his other children, and reciting therein the reason why he so disposed of his property. This will was either lost or destroyed, but the scrivener who wrote it testified to its contents as above, and the reasons given by testator, in conversation at the time of writing the will, for the manner of his disposition of the property. Upon the decease of the father, George H. Pool procured himself to be appointed administrator of the estate, and his brother, the plaintiff, filed his claim, duly verified, for the sum of $3,579.27, for work and labor performed at the request of and during his father's lifetime at the rate of $40 per month, and for items of expenditure, which claim was disallowed by the administrator, whereupon this action was commenced upon a *quantum meruit*. The case was tried to a jury and a verdict was rendered for the sum of $2,000 in favor of W. B. Pool, plaintiff below and defendant in error here, and judgment rendered thereon for said sum and costs. The administrator brings error.

It is assigned as error that the petition does not state facts sufficient to constitute a cause of action, and that the proof is insufficient to warrant a recovery.. It is contended by the administrator that the case upon the facts falls within the rule announced by this court in Hay v. Peterson, 6 Wyo., at page 423, 45 Pac. at page 1073, 34 L. R. A. 581, and which is as follows: "If the person performing such services lives in and is one of the family of the other, for whom the services are performed, being provided with food, clothing, lodging and care as one of the family, and doing labor and

work for such other person, and, as a matter of fact, there is no contract between them relating to or providing for any compensation to be paid for such work and labor, then no action can be maintained." The inapplicability of the rule to the facts here is apparent. Here an express contract was proven, that is to say, if the son would return to the parental roof, and work for his father and mother during their lifetime, then the father would give him all of his property at the time of his death. Upon this question the scrivener who wrote the will at the request of decedent testified to a conversation had with him at the time he made the will, as follows:

"Q. You may state to the jury whether or not at that time you had any conversation with Daniel James Pool relative to any work, labor, or moneys that the plaintiff had advanced in relation to work or labor performed on the deceased's ranch and improvements made thereon?

"A. I had such a conversation with him.

"Q. What did he say to you about that?

"A. He said that some five or six years previous to this conversation, his son, W. B. Pool, had come to work for him upon his place. That his coming had been in pursuance of a contract between them, to the effect that if the son would come and work upon the place, for the father and mother during their lifetime, that he would pay him by giving him all he had at his death. He said that he had made this offer to the other members of the family and that the offer had been refused. He said that in pursuance of this offer the boy had left his business in Sheridan County, and had come to live with him on the place, and had at that time worked for him about four, or five, or six years. That in addition to the work of caring for the place the boy had put some of his own money into certain improvements upon the place; that he was growing old and that certain troubles in the family had emphasized the necessity of concentrating the understanding and contract between himself and his son and that he desired to make a will whereby his son would

inherit his real and personal property at his death. He said with reference to his other children that it was his understanding of the *law* that they should be left some portion of his estate else the will would be illegal. I told him I knew of no law that would render the will illegal for that reason, but he insisted that the will should be so drawn that the children should be mentioned individually and that the sum of twenty-five dollars should be left to each of them and that the remainder of the estate, both real and personal, of every kind and nature, should go to his son, William B. Pool. He further requested that an explanation should be entered in the will of why he did this, explaining at the same time that he had had an understanding with the other children that this should be the manner of the disposition of his property. I made the will in conformity with this request. He read it over and signed it, expressing an earnest desire that there should be no trouble about it. He asked me if it would stick. I told him I thought it would. I then explained to him that it had to be witnessed by someone and he went out and was gone some few minutes and came back with Richard M. Kennedy and J. M. Sonnamaker and they signed as witnesses to the will. After the signing of the will I put it in an ordinary envelope and he said, 'What must I do with this?' I said do whatever you please; we have a place here to keep it or you can take it anywhere you want to. 'Well,' he says, 'now I have a little package down at the bank with Mr. Thom, will that be all right?' I said I think so, so he took it away. He didn't speak to me about this matter after that until some time during February, March, or possibly April, of 1910; he then spoke to me again in the store of Mr. Adams and Young and in that conversation he said 'Do you remember making a will for me?' Yes, I do. 'Do you remember in that will that my wife was spoken of— that the boy should keep her upon the ranch and maintain her in the manner in which she has been maintained in case I preceded her to the grave?' I said, Yes, I remember that, and he said 'Is there any change necessary in that now she

has gone? She has passed away,' and I said, Yes, I understand she is dead, Mr. Pool, but I don't think any change is necessary on that account, and that's about all I now recollect in regard to the matter."

There is other evidence in the record showing the intention of the father to compensate his son, the defendant in error, for his services. On March 20, 1907, the son married and took his wife to live on the farm where they lived until August 10, 1910, with the exception of from December 17, 1907, until May 1, 1908, during which time they were in California on account of the wife's health. They then returned to the farm in response to a telegram from the young wife's father saying that both Daniel J. and his wife were ill. Helen Pool, the son's wife, testified that she had several conversations with her husband's father as to how her husband was to be compensated for his work. That the father had said her husband had left his interests, his own work, and came there to take care of him and his mother, to run the ranch, and he didn't have any way of paying him, and he was going to pay him when he was gone by giving him his property. That afterward there was trouble in the family and she wanted to leave and he said "No, that we must stay there and take care of him, that that was our home.

Q. "Did he at that time or any time later say anything about payment?

A. "He often spoke about paying my husband by leaving him his property.

Q. "Did he, in course of the conversation, Mrs. Pool, ever tell you when it was—or how long your husband had worked for him?

A. "He didn't tell me the year. He said that when he left Prairie Dog he came there to live."

A week after the ranch was sold in August, 1910, the plaintiff, his wife and Daniel J. Pool removed to California, where they resided until the death of the latter on October 3, 1911. Charles A. Buel, who was sworn and testified as

a witness in behalf of W. B. Pool that his daughter was the wife of the plaintiff; that she came over to his home one day during 1908 and he went over to Mr. Pool's; and also as follows:

Q. "Go on and state what conversation you had with Mr. Pool, at the time after your daughter came home and you went to see him.

A. "He said they couldn't agree in the house and 'It is hard for me to live here alone without her. I didn't want her to go away,' he said, 'I have a hard time.' I will express it just as he said it. He always called his wife, to me, the old woman. I don't like to use the expression but that is the words he used. He said 'I had a hard time to get the old woman to live in the building, but,' he says, 'we finally prevailed upon her to live there. 'Now,' he says, 'Willie has got married and they don't agree to living here. Now, if you will get them to come back and stay here I will build them another house to live in.'

Q. "Go on and state the conversation.

A. "He said, 'I owe all I have got to Willie. He has taken care of me. He has come here and took care of me and done what I asked him to do without compensation; I owe it to him. I owe it to him and the only way that I have got to pay him is to keep him here. If he will stay here and take care of me and the old woman as long as we live he shall have this property. That is the only way I can pay him.' * * *

Q. "I omitted to ask you also, Mr. Buel—I don't know whether you had any conversation with the old man—did he give you any reason at the time you had the conversation with him why he wanted to compensate Will and give him his property?

A. "For staying there and taking care of him and working the place he said. He said he owed it to him.

Q. "Did he say anything about the others?

A. "He said there didn't any of the rest of them want to live with him.

Q. "And meaning the other relatives?

A. "I suppose that is what he meant. That is the words he used."

Mr. Ed Kelle was sworn and testified as a witness on behalf of the plaintiff that in the fall or early winter of 1909 he had a conversation with the deceased relative to his paying the plaintiff and as to when the plaintiff came from Sheridan County to work on the ranch, and further testified as follows:

Q. "Now, tell the jury just what the old gentleman said to you about these matters?

A. "Mr. Daniel Pool and I were very much attached to one another and visited quite often together. That is, when we were alone and he often told me about his affairs there and asked me not to speak to anybody about them, because he didn't care to have them public, and I would also tell him about a case I had and we would speak about our cases amongst one another, and he told me that he didn't know what he would do if it wasn't for his son helping him on the place. He said his son lived on Prairie Dog and he didn't have anybody there and it was hard to have any hired man come and take care of the place the way it should be, and he had asked his son to come and help him, and his son gave up his place and came and helped him and he also said he expected to pay his son very well for helping him on the ranch.

Q. "Now did he say, Mr. Kelle, he expected to pay his son?

A. "Well, he said he expected, the way that Willie had worked there, that he expected to pay him by letting him have the place and that was the only way that he could pay him for what he had done for him.

Q. "When you speak of the old gentleman speaking about his son, to which one did he refer?

A. "He referred to Willie Pool.

Q. "The plaintiff in this suit?

A. "Yes, sir.

Q. "In the course of your conversations with him, Mr. Kelle, did he state anything about the other children, that he could, or could not get along with them, and why he wanted to pay Willie?

A. "He said that Willie was the only one that would come and take care of him and he was his favorite in that way; that he would sooner have Willie come and take care of him than any of the rest as he had asked the rest and they had refused and he had asked Willie to come and he had quit his place and had come and took care of him and had took care of the place for him. * * *

Q. "What did he say in reference to having made his will, if anything, and concerning the payment, and how it was to be made to the plaintiff for his work and labor?

A. "Well, he said he had made out a will and that he had made it out mostly to his boy Will, as Will had worked there on the place and that he had put his money into the place and he wanted to repay him by the will.

Q. "That is, give his property to him?

A. "Yes, sir. * * *

Q. "I want you to give his language. Give what he said?

A. "That is what he said.

Q. "Give his words, now, just as though it was Mr. Pool speaking?

A. "He said I have made out a will, and, he said I have made it out mostly to the boy for the work he has done here on the place, to repay him for the money he had put into the place."

This evidence clearly shows an intention upon the part of the deceased and an understanding between him and his son William B., the plaintiff, that the latter should be compensated for his services, and that the services were rendered in pursuance of such understanding, and we are of the opinion that there was sufficient evidence to support the verdict. It is however urged that no recovery could be had upon *quantum meruit,* but should if at all be by and

through the will. The evidence tends to show that the will upon being executed was deposited in the bank by deceased where he kept his private papers, and that during his lifetime the will was known to exist until a short time before he sold the farm and departed for California, when it disappeared. The inference is that the decedent upon the sale of the land destroyed the will. Conceding that to be the fact, there was then no will to probate, but that did not relieve the father from the duty of compensating his son as he had agreed to do. The fact was amply proven that the defendant in error did abandon his private interests at the request of his father and returned to the family homestead for the purpose of managing his father's farm and working for his aged parents, and he was the only one of the children who would do so. In Hay, executor, v. Peterson, *supra,* there was no blood relation between the testator and Peterson, who sued the executor for services rendered to Strom, the testator, during his lifetime. There was a claim that Peterson was a member of Strom's family, clothed and subsisted as such without any promise to pay for his services. This claim was not sustained by the evidence. Upon the facts here the right to recover upon a *quantum meruit* is supported by authority. In Norton's Estate v. McAlister, 22 Colo. App. 293, 123 Pac. 963, the deceased hired his niece to care for him during his declining years, and agreed to compensate her at his death by giving her certain named real estate which he failed to do, and it was held that she was entitled to maintain an action on the *quantum meruit* for the value of her services. So in the case at bar the deceased agreed to give his son practically all of his property at the time of his death in consideration for his services, and having failed to do so the value of such services so rendered under the contract could be recovered upon the *quantum meruit* under the rule announced by the court in Norton's Estate, *supra.* It would indeed be a harsh rule to hold that after defendant in error had performed his part of the contract and nothing was left

but to pay him in property, that because of the failure of the decedent to make provision for his payment as he had agreed, the defendant should be barred from recovery. The case was tried upon the theory that the services were rendered in pursuance of an express contract and there was evidence sufficient to go to the jury as to the existence of such contract and having found that such contract existed but was unperformed by the father, the son was entitled to maintain this action as upon *quantum meruit.* Of course the father did not agree to pay his son at the rate of $40 per month for his services, but the law in such case, the decedent having failed to carry out his part of the agreement during his lifetime, permits a recovery for the value of the services rendered. (Norton's Estate, *supra.*) The allegations of the petition were sufficient to permit of such proof and for that reason stated facts sufficient to constitute a cause of action in favor of the plaintiff and against the defendant. The jury were instructed in accordance with the theory upon which the case was tried. We discover no error in the record and the judgment will be affirmed.                                             *Affirmed.*

POTTER, J., and BEARD, J., concur.