78 N.J. Super. 8 (1963)
187 A.2d 357
IRMA GLUCKAUF, ADMINISTRATRIX AD PROSEQUENDUM OF PETER GLUCKAUF, DECEASED, AND IRMA GLUCKAUF, ADMINISTRATRIX OF THE ESTATE OF PETER GLUCKAUF, DECEASED, PLAINTIFF-RESPONDENT,
v.
PINE LAKE BEACH CLUB, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1962.
Decided January 10, 1963.
*13 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Philip C. Geibel argued the cause for appellant (Mr. J. Emmet Cassidy, attorney).
Mr. Bernard Chazen argued the cause for respondent (Messrs. Baker, Garber & Chazen, attorneys; Mr. Nathan Baker, of counsel; Mr. Chazen on the brief).
The opinion of the court was delivered by KILKENNY, J.A.D.
Plaintiff's negligence action against defendant under the Wrongful Death Act, N.J.S. 2A:31-1 et seq., was tried in the Superior Court, Law Division, before a jury and resulted in a verdict in plaintiff's favor in the sum of $32,500. Defendant's motion for a new trial on the several grounds stated therein was denied. Defendant brings this appeal from the resultant judgment.
On September 2, 1960 Irma Gluckauf (hereinafter "plaintiff"), a 47-year-old widow, went with her son Peter (hereinafter *14 "decedent"), then 15 years old, to the Pine Lakes Swimming Club, operated by defendant and located in Washington Township, New Jersey, to enjoy the facilities there as patrons and invitees of the defendant. They were accompanied by plaintiff's sister, Mrs. Lena Scarano, and her three children. Mrs. Scarano paid the admission for everyone in their party. They arrived about 2 P.M., and this was the first time plaintiff and decedent had been to this swimming club.
This lake is approximately 300 feet long and 250 feet wide, with a float situated near its middle. The lake is about nine feet deep at the float. It has a diving area at one end where the depth is also approximately nine feet. There is a roped off area for small children where the water is shallow.
Decedent changed into his bathing suit and went into the lake for a swim. He began at the area roped off for children and started to swim toward the diving area. His actual destination was unknown because no one was informed of his intentions either before he went into the lake or at any time after he entered the water. As he swam he moved fast at first and then began to slow down. Next, he appeared to be standing in one place and suddenly he went under and drowned. His body was recovered approximately 25 minutes after he submerged. There was no evidence as to why he went under. Plaintiff testified that decedent was in good health, although he was near-sighted. He gave no distress signal before submerging.
Plaintiff witnessed the happening and testified to the above facts. When her son went under, she ran along the beach screaming, "Help my boy. He is in there. Help." No one seemed to hear her at first. Finally, people gathered around her and asked, "Where, where?" She answered, "In there. I saw him go under." In her words, "They didn't believe me." Someone suggested paging the boy over the loud speaker and this was done with obvious lack of success. Plaintiff kept insisting, "My boy is in there. He isn't anywhere else. He is in the water. Why don't you go in and do something?" Finally, people began diving for him and his *15 body was recovered from the lake after the 25-minute lapse noted above.
Plaintiff testified that decedent "loved swimming"; had been in camp for two summers where he swam; on nice Sundays she and he went to the High Bridge Park Swimming Pool in New York City; he did the crawl stroke; and "he was a good swimmer." Immediately prior to the fatal happening she saw him swimming "and he swam very nicely" toward the diving area. He engaged in full physical activity in school, had a physical checkup once a year and was in good health. She reiterated on cross-examination that he was "a pretty good swimmer," had swimming lessons at camp, where he spent a month for two successive summers during 1952 and 1953, and had been swimming from that time on.
Mrs. Scarano, decedent's aunt, who witnessed the tragic episode, corroborated the details testified to by her sister, the plaintiff. She had watched the decedent from the time he began swimming at defendant's pool and thought "he swam very well" up to the point where he slowed down, and then she became apprehensive. She looked at the lifeguard who appeared to be watching decedent at that point "but then he turned his head away." She testified that this lifeguard later said during the commotion, while standing next to her, "I watched him slow down but I thought he had made it." She described the distance travelled by decedent before getting into trouble as "maybe twenty feet," and then referred to it as a little more than the courtroom. The courtroom length is not specified in the record.
The gravamen of the complaint was the defendant was negligent in failing to provide an adequate number of trained lifeguards, failing to have adequate rescue apparatus available, failing through its servants, agents and employees to promptly initiate rescue operations and to promptly procure proper and adequate rescue apparatus, and failure of defendant's employees to keep a proper lookout for persons in the pool. There was sufficient evidence at the trial from which *16 the jury could reasonably conclude that defendant was negligent in these particulars.
There was testimony that defendant did not have present and ready for use adequate life saving equipment, such as ring buoys, heavy lines, bamboo poles and grappling irons; did not have a rowboat with a lifeguard and proper equipment in it in the deep water area near the float; did not have proper ropes and float lines in the deep water area to serve as resting places for tired swimmers and for emergencies; did not, at the time of this happening, have a lifeguard at the lifeguard station near the dam; did not have properly trained and experienced personnel as lifeguards, but instead used lifeguards between the ages of 15 and 19 and an acting head lifeguard who was only 18 years old; did not have adequate life saving drills and instruction in co-ordinated rescue procedures; did not act with due care in looking out for decedent and failed to come promptly to his aid; unreasonably delayed rescue procedures, thus precluding the chance of using artificial respiration; and failed to conduct the rescue in accordance with standard practice. There was expert testimony that these omissions and failures to act on defendant's part were contrary to proper procedures.
Decedent was slightly more than 15 1/2 years old at his death, having been born on February 16, 1945. His father had predeceased him by about 10 years. Besides his widowed mother, then 47 years old, he was survived by a sister, Joan, who was 21 years old at the time of the trial in April 1962. Joan was then attending the graduate school of the University of Copenhagen in Denmark on a Fulbright scholarship, which covered all her expenses, including tuition, transportation and living costs. She had also won the Woodrow Wilson Fellowship to Radcliffe College, beginning in September 1962. Plaintiff, before the happening on September 2, 1960, had been employed by a publishing house where she earned between $40 and $50 dollars a week. After this tragedy she had no earnings.
*17 Decedent had been attending Bronx High School of Science and was about to enter his junior year there. This is a special New York City high school for gifted students who qualify for entrance by taking special examinations, by having high IQs, and by recommendation from their previous schools. Thus, only top students throughout the city are enrolled in this school. He had always been an exceptionally bright student. His mother testified that he had an IQ of 153 when he was seven or eight years old. He had twice won his grammar school spelling championship. He was best or second best in his high school class, averaging 95. He had tutored children of his sophomore class in Latin; had passed a New York Regents test in mathematics with a mark of 100; and had received 98 in a biology test. The boy had special musical talent and creative ability. He planned to go to college and take courses in the field of science in order to become a biochemist. Kenneth Bobrowsky, science co-ordinator at Bronx High School of Science, testified that he was decedent's science and project teacher in his sophomore year and the boy, "one of the most serious, diligent, competent and hard working students in the class," was in the top 1% of his class of about 800 students. He excelled in biology and mathematics. His high school IQ was 157, a very high rating according to Mr. Bobrowsky, who said, "Genius is 160 and above."
Decedent rendered services in and about the household, keeping his own room clean, vacuum cleaning all around, fixing "electrical things," venetian blinds and the like, going to the store and performing other chores. In addition, he did summer work carrying groceries at a grocery store and thereby earned "a few dollars," with which he bought something for his mother. Plaintiff provided his food and clothing and gave him $4 weekly for his school lunch and carfare.
We now consider, in the order presented, the five points advanced by defendant for reversal of the judgment.

*18 I.
Defendant's first contention is that the trial court erred in removing from the jury's consideration its pleaded defense of contributory negligence. We note in limine a procedural deficiency in defendant's legal position as to this claim of error.
The trial record shows the following. At the close of all the evidence, plaintiff moved to strike the defense of contributory negligence. Without expressly stating that the motion was being granted, such a result was presumably intended by the trial court when it said in response to this motion, "I shall not charge contributory negligence." When this announcement was made, defendant's attorney offered no objection and made no request to be heard on the matter. Instead, defendant apparently assented tacitly to the ruling. In its motions for a judgment of dismissal at the end of plaintiff's case and at the close of all the evidence, it did not assert in support thereof any claim of contributory negligence. It made no request to the court to charge contributory negligence and offered no objection to the absence of any such instruction from the charge as given by the trial court. We note, in passing, that in its subsequent application for a new trial, defendant did not allege among its numerous grounds therefor any claim of error by the trial court in its ruling on the issue of contributory negligence.
Thus, at no time did the defendant object to this trial ruling or alert the trial court to any disapproval by it as to the trial court's action in this respect. Having failed to comply with the letter and spirit of R.R. 4:47, defendant may not justifiably assert this trial ruling for the first time on appeal as a basis for reversing the judgment. The purpose of informing the court of the supposed error is to give it an opportunity to reconsider its ruling and to make any change deemed advisable. Roberts Electric, Inc. v. Foundations and Excavations, Inc., 5 N.J. 426, 431 (1950); Valls v. Paramus *19 Bathing Beach, Inc., 46 N.J. Super. 353, 357 (App. Div. 1957).
Furthermore, we find that on the merits the trial court was justified in ruling out the defense of contributory negligence, even if defendant by formal objection or otherwise had indicated its timely disapproval of this action. The trial record does not disclose any substantial evidence on the basis of which the jury could reasonably have found decedent guilty of contributory negligence.
Defendant now concedes that Cloyes v. Delaware Township, 23 N.J. 324, 326 (1957), is dispositive of any contention that negligence on the part of the plaintiff mother could bar recovery under the Death Act, even though it so contended in the pretrial order. But defendant does argue that the testimony of the police officer, Justin Georgetti, who arrived at the scene when they were diving to locate the body and who found the mother and aunt "very excited, running back and forth," and thereafter took a statement from the distraught mother in which she said "the boy thought he was a good swimmer but he wasn't," was evidence from which the jury could find decedent guilty of contributory negligence. This statement of opinion and of the mental operation of another, made under obviously great emotional stress and not based upon any evidence in the record beyond her ipse dixit, was at most a scintilla of evidence which, against the proof, noted above, of the boy's ability to swim, was not sufficient to justify a charge of contributory negligence.
Defendant also urges that decedent was in deep water "apparently trying to swim the entire width or length of the lake," and failed "before he submerged under water to have requested help or give some audible signal of his need for assistance." There is no basis for the assertion that he was apparently trying to swim the length or width of the lake. There was a float halfway across. His quick submersion before the eyes of his own mother and aunt evidences the practical impossibility of any request or signal for help.
*20 In short, a jury could not reasonably find the decedent guilty of contributory negligence under the facts and circumstances of this case. Furthermore, there is a presumption that the decedent exercised due care for his own safety. Bergquist v. Penterman, 46 N.J. Super. 74 (App. Div. 1957), certif. den. 25 N.J. 55 (1957). No presumption of negligence arose from the mere happening of the accident. Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 391 (App. Div. 1962). Accordingly, the trial ruling in this regard was proper.

II.
The next claim of error is that the trial court erroneously denied defendant's motion for judgment at the end of plaintiff's case and at the end of the entire case. These motions were made on two grounds, viz., (1) plaintiff had failed to establish any negligence on the part of the defendant, and (2) there had been no proof of any pecuniary loss. Under this point, we consider only ground (1), reserving ground (2) for analysis under defendant's Point III hereinafter.
In considering the propriety of these trial rulings, we must accept as true all evidence which supports plaintiff's view and must give her the benefit of all inferences which may logically and legitimately be drawn therefrom in her favor. Sanzari v. Rosenfeld, 34 N.J. 128, 132 (1961). Where fairminded men might honestly differ as to the conclusions to be drawn from the proofs, the questions at issue should be submitted to the jury. Mellon v. Pennsylvania-Reading Seashore Lines, 7 N.J. 415, 420 (1951).
The jury could find from the evidence many acts or omissions amounting to negligence on the part of defendant, as noted above, and that they probably were the proximate cause of decedent's unfortunate death. There were conflicts in the testimony of the witnesses for the respective parties as to what defendant's employees did or failed to do and the *21 time lapse involved before action taken. By reason of these conflicts and the questions of fact engendered thereby, the trial court acted properly in submitting them to the jury for resolution.

III.
Under its third point, defendant argues that the jury verdict of $32,500 was arrived at by mistake, passion and prejudice, and was contrary to the weight of the evidence.
The case was tried and submitted to the jury solely as a claim under the Wrongful Death Act, N.J.S. 2A:31-1 et seq. N.J.S. 2A:31-5 regulates the assessment of damages by a jury under that act and provides:
"* * * the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death to the persons entitled to any intestate personal property of the decedent."
Such persons in this case would be decedent's mother and sister.
"Pecuniary injuries" in the statute has been interpreted to mean the "deprivation of a reasonable expectation of a pecuniary advantage, which would have resulted by a continuance of the life of the deceased." Carter v. West Jersey & Seashore R.R. Co., 76 N.J.L. 602 (E. & A. 1908); McStay v. Przychocki, 9 N.J. Super. 365, 369 (Cty. Ct. 1950), affirmed 10 N.J. Super. 455 (App. Div. 1950), affirmed 7 N.J. 456, 460 (1951). For example, "the jury could consider the pecuniary loss the mother suffered by being prospectively deprived of such contributions to her support" as her son might make (McStay, 9 N.J. Super., at p. 370), but is not limited to contributions, for in determining the proper amount of damages to be awarded in an action for death of minors all probabilities and every reasonable expectation, bearing upon pecuniary injury, should be taken into account, and "the jury must weigh probabilities and to a *22 large extent form their estimate of damages on conjectures and uncertainties." (McStay, 10 N.J. Super., at p. 458.) At the same time, the McStay case, 10 N.J. Super., at p. 463, notes, "It ought to be possible to support an award of damages on some analysis that has its basis in the evidence and in that common knowledge and experience which men in general have and to which the jurymen may properly resort."
The mother, as the sole surviving parent, would have been entitled to the earnings of decedent during his minority. Perhaps these earnings would not have been substantial before decedent reached the age of 21 because of the probability of his using up those six intervening years in the completion of his high school and college work, and perhaps, for some period thereafter in graduate study. The jury could, nonetheless, take into consideration the monetary value of his services in and about the household and possible income from summer jobs, while he was still only a student, offset by the cost of his maintenance. It is reasonable to assume that the expenses of college and graduate study would have been met by scholarship and fellowship grants in view of his very high intellectual capacity.
However, once decedent began to earn money, it was probable that his earning capacity as a biochemist or in some comparable field of science would have been relatively high and would have increased substantially with the passing years. We are not unmindful of the great scientific advances in our modern world and the golden opportunities that lie before men of outstanding scientific ability.
This was no ordinary boy, as indicated above. His teacher described him as one whose 157 IQ "is exceedingly high  approaching a genius." His superlative scholastic rank in a very competitive school attended only by top students placed him so far above the others that his teacher testified:
"He really didn't fit in with them, even in this bright school. He was above them in competence and diligence. This, combined with ability, would push or motivate a student to be really successful in anything he did."
*23 There was uncontradicted testimony by an actuarial expert that plaintiff, 49 years old at the time of trial in April 1962, then had a life expectancy of 27.62 years. According to the mortality table, her 15-year-old son would have outlived her by many years because his life expectancy at age 15 was 54 years and at age 21 would have been 48.6 years. She was deprived of a reasonable expectation of support and maintenance from him for a period of approximately 20 years. Even allowing for the rule that the award must represent no more than the present value of the expectancy of future net pecuniary benefits, and even in the face of life's uncertainties and the probability of decedent's marrying and rearing a family, we cannot conclude that the $32,500 allowed by the jury so clearly exceeds the value of the mother's expectancy as to justify our setting the verdict aside as excessive.
Defendant urges on this appeal that there was no proof before the trial court to show that decedent's sister was dependent upon him and that it was "plain error" for the trial court to have included in its charge, "What would be the thing that she [the mother] and the daughter lost financially by reason of his death?" Defendant made no objection to this part of the charge. We do not regard the inclusion of this question as plain error. It is reasonable to assume that the jury, in arriving at its verdict, was not influenced by a consideration of any material prospective pecuniary loss by decedent's sister. Common experience tells us that an able-bodied, normal, highly educated, 21-year-old girl of her attainment would have little or no expectancy of future pecuniary benefit from a 15 1/2-year-old brother going to high school at the time of his death. Thus, in calculating the reasonableness of the award, we have considered it essentially as the prospective pecuniary loss sustained by the widowed mother as the result of the untimely death of her brilliant and talented son.
Although the verdict may seem to be high for the death of a 15-year-old boy, we have concluded that because of the special circumstances herein it does not clearly and convincingly *24 appear that the verdict is excessive or the result of bias, passion, prejudice or mistake. The trial court did not err in denying defendant's motion for a new trial on this ground. We do not feel that we should substitute our judgment in this case for that of the jury. Cf. Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381 (App. Div. 1962).

IV.
Defendant alleges that the trial court erroneously permitted decedent's mother to testify to her health and earnings following the accident of September 2, 1960.
Plaintiff was permitted to testify, over defendant's objection, that she earned between $40 and $50 dollars a week before the occurrence. Much later in her interrogation her attorney asked her if she continued to work after this occurrence, and, before any objection was interposed, she answered, "No, I didn't." Immediately following her answer, defendant's attorney objected that it was immaterial and the trial judge ruled that he would allow it. She was then asked what earnings she had since September 2, 1960 and she replied, "I had none." She then volunteered, "I became very despondent over this thing." Thereupon, defendant's attorney objected. The trial judge stated that no claim could be made as to the effect upon her, but the evidence would be received as to her earnings between the time of the accident and the time of trial. Thereafter, she testified that she couldn't return to work and hadn't returned up to the time of trial because "I was too nervous and I couldn't concentrate," and had made no earnings at all.
Defendant argues that the introduction of evidence of this nature was highly prejudicial to it and was improper because the wages of decedent's mother had nothing to do with her alleged pecuniary loss as next of kin. It also contends that the trial court should have made reference in its charge that the evidence as to the mother's wages "was only to show her status and had no bearing on any earning capacity of the decedent or as a direct loss to the next of kin."
*25 In the first place, defendant made no request for any such instruction and made no objection to its omission from the charge as given. We do not regard the lack of any such instruction as plain error. Furthermore, the trial court told the jury, in referring to the mother's earnings before and after the occurrence, that the law "does not contemplate compensation on the basis of bereavement, suffering, anguish or loss by reason of affection for anyone who has departed." It correctly charged that "the recovery is for the deprivation of the reasonable expectancy of a pecuniary advantage which would have resulted from the continuation of the life of the deceased." The jurors were told that they "should not permit sympathy, passion, bias or prejudice" to interfere with or affect them in any degree. A fair reading of the entire charge indicates that the jury was fully informed as to the only proper factors which could enter into their calculation of damages, if they determined liability in favor of plaintiff, and at no time was it said or suggested that the mother's loss of earnings due to her emotional stress was one of those factors.
In our opinion in the McStay case, supra, 10 N.J. Super., at p. 459, we noted,
"The cause of action vested upon the death of the boys but the quantum of damages was determinable in the light of the situation existing at the time of the trial."
Upon the basis of that rule, it was not error to show the family situation at the time of the trial.

V.
Defendant's final point is that the trial court committed "plain error" in charging the jury that defendant not only owed a duty of reasonable care to maintain the premises, but owed an additional duty to decedent to provide lifeguards and suitable appliances.
*26 Reliance is placed on the plain error rule, R.R. 1:5-3(c), because the defendant made no objection to the trial court's instructions in this respect at the trial. Moreover, it did not raise this issue when it applied for a new trial. Plain error is some legal impropriety affecting the substantial rights of a party "and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. DeMarco, 76 N.J. Super. 318, 323 (App. Div. 1962).
Defendant claims impropriety in the following portion of the charge:
"It is a principle of law that the owner or proprietor of a resort to which people are generally, expressly or by implication invited to come are legally bound to exercise ordinary care and prudence in the maintenance of and management of such resorts to the end of making them reasonably safe for the patrons.
When the business is that of keeping or carrying on a bathing resort or swimming pool, the proprietor or owner thereof is not only required to exercise the same degree of care and prudence with respect to keeping the premises in a reasonably safe condition which the law imposes upon the keeper of public resorts generally for the protection of their patrons, but the law imposes upon them the additional duty when the character and condition of the resorts are such that because of deep water or other causes the bathers may get into danger, of having in attendance some suitable person or persons with the necessary appliances to effect rescues, to supervise the bathers, and rescue those apparently in danger."
Defendant admits that it was "under a duty to use reasonable care for the safeguarding and protection of its patrons in their use of the pool," Lipton v. Dreamland Park Co., 121 N.J.L. 554, 555 (E. & A. 1939), but it argues that the above instruction improperly placed an additional burden upon it beyond the duty of exercising reasonable care. We do not so interpret the charge. Its fair meaning is that proprietors of all public resorts are under a general duty of exercising ordinary care in their maintenance and in making them reasonably safe for their patrons; and proprietors of public bathing resorts, in fulfillment of that general duty of *27 reasonable care, have the specific duty of having suitable persons in attendance and necessary appliances on hand so that bathers, who might get into danger because of deep water, may be properly supervised and effectively rescued, if the need arises. Hence, there was no plain error in this instruction.
We note, too, that the trial court made this further cautionary statement:
"The owner or proprietor of a bathing resort or a swimming pool is not bound to provide a sufficient number of skilled attendants to insure the safety of his patrons, but is only bound to exercise ordinary care to provide a reasonably sufficient number for such purpose."
Throughout the entire charge, the jury was constantly reminded that defendant's only duty was to exercise reasonable care and that defendant was not an insurer of the safety of its patrons.
Finding no prejudicial error, the judgment is affirmed.