Robert CLARK, Suzanne Clark, and
Robert J. Clark, II, Appellants
(Defendants),

v.

Loren GALE, Personal Representative
of the Estate of Leona F. Ganow,
Deceased, Appellee (Plaintiff).

Loren GALE, Personal Representative of
the Estate of Leona F. Ganow, De-
ceased, Appellant (Plaintiff),

v.

Robert CLARK and Suzanne Clark,
Appellees (Defendants).

Nos. 97–312, 97–313.

Supreme Court of Wyoming.

Oct. 2, 1998.

William L. Miller of Miller & Fasse, P.C., Riverton, for the Clarks.

Frank Andrews, Riverton, for Loren Gale.

Before LEHMAN, C.J., and MACY, GOLDEN and TAYLOR,* JJ.; and NICHOLAS G. KALOKATHIS, D.J.

MACY, Justice.

This case involves a dispute over estate assets. The trial court held a jury trial and entered a judgment and order in accordance with the jury's verdict. The parties cross-

* Chief Justice at time of oral argument.

appealed from the trial court's judgment and order.

We affirm in part, reverse in part, and remand.

## ISSUES

In Case No. 97–312, Appellants Robert Clark (Bob), Suzanne Clark (Suzanne), and Robert Clark II (Robbie) (hereinafter referred to collectively as "the Clarks") present the following issues on appeal:

I. Did the trial court err when it allowed testimony regarding what a deceased person had said over the defendant[s'] hearsay objections?

II. Did the trial court err when it allowed a witness to testify that the decedent "appeared to trust" one of the defendants?

III. Did the trial court err when it refused to permit the defendants to inquire into why the plaintiff chose not to pursue the estate of a previously named defendant?

In Case No. 97–313, Appellant Loren Gale (Loren), as the personal representative of the estate, offers the following issues, which he phrased as statements, for our review:

A. There was no legally sufficient evidentiary basis to support a money judgment for services to a family member in the household[.]

B. The money judgment was contrary to law[.]

## FACTS

Leona Ganow (Leona) and Earl Ganow (Earl) had three children: Ramona Gale (Ramona); Delores Clark (Delores); and Wayne Ganow. Loren was Ramona's husband. Delores was married to Bob, and they had two children: Suzanne and Robbie.

Although there were some discrepancies in the record, it appears that Delores and her two children lived with Leona and Earl in their home in Riverton from 1972 until 1977. Bob was working away from Riverton during the weeks, but he spent his weekends in an apartment in the Ganows' garage. Bob and Delores were granted a divorce in 1978, and Earl passed away in December 1981.

Bob filed for bankruptcy in 1985 and again in 1987. In 1989, a creditor bank foreclosed upon Bob's ranch. Bob lived in Leona's garage apartment from October 1990 until the summer of 1991 when he moved to Chicago, Illinois. He returned to Riverton in the summer of 1992, and he resided in the garage apartment from that time forward. Delores apparently lived with Leona again from July 1992 until February 1993. Delores passed away later in 1993.

Bob did not pay rent or for the utilities on the apartment, and Leona paid for most of his food and other expenses. Bob worked around the house, doing odd jobs and helping to care for Leona. In 1994, Bob began helping Leona manage her financial affairs.

In December 1994, Leona executed a durable power of attorney appointing Ramona as her attorney in fact. She also executed a will devising her real property to Ramona and reserving a life estate in the apartment for Bob. Leona prepared a personal property addendum to her will that provided the household goods and furnishings would go to Bob, Suzanne, and Robbie.

In June 1995, Suzanne returned to Riverton to help care for Leona. Suzanne was in the process of obtaining a divorce, and she did not have a place to live or a vehicle to drive. Suzanne lived in Leona's house and did not pay rent.

In July 1995, Leona underwent surgery, and, during the night following the surgery, she became disoriented. The next day, various members of the family had a heated discussion about getting full-time care for Leona. Although the family did not reach an agreement with regard to Leona's care, Suzanne continued to live with her grandmother and to care for her.

On September 27, 1995, Leona revoked the durable power of attorney appointing Ramona as her attorney in fact, and she executed a new durable power of attorney appointing her sister, Bernice Burns (Bernice), as her attorney in fact. On September 30, 1995, Bernice, as Leona's attorney in fact, executed

a quitclaim deed to convey Leona's house to Robbie and Suzanne, as joint tenants.

In November 1995, Leona suffered a serious stroke. The district court subsequently appointed Ramona as the conservator of Leona's estate and Suzanne as the guardian of her person. Leona died on December 28, 1995; she was eighty-two years old at the time of her death. In accordance with her will, Loren was appointed as the personal representative for Leona's estate. He filed an action in the district court against Bob, Suzanne, Robbie, and Bernice to have the quitclaim deed set aside that was executed by Bernice on Leona's behalf and to quiet title to the property in the estate. Loren claimed that Leona was incompetent to execute the power of attorney in favor of Bernice and that Bernice did not have the authority to convey Leona's real property. He also asserted claims against Bob, Suzanne, Robbie, and Bernice for conspiracy to defraud.

The defendants answered Loren's complaint, and Bob and Suzanne filed counterclaims for payment from the estate for the services they had rendered to Leona during her lifetime. Bernice died before the case was tried, and Loren elected not to pursue his claims against her estate. The case was eventually tried to a jury, and the jury returned special interrogatories finding that: (1) Leona was competent to execute the durable power of attorney in favor of Bernice; (2) Bob and Suzanne exercised undue influence over Leona; (3) Bernice exceeded her authority as attorney in fact when she executed the quitclaim deed; (4) Leona did not ratify Bernice's conveyance of the property; and (5) Bob was entitled to receive $21,738.36 and Suzanne was entitled to receive $21,738.37 for the services they had provided to Leona. The trial court entered a judgment and order on the basis of the jury's verdict. The Clarks and Loren subsequently perfected their cross-appeals to this Court.

## DISCUSSION

### A. Evidentiary Rulings—Case No. 97–312

In Case No. 97–312, the Clarks claim that the trial court erred by either allowing improper evidence to be admitted or refusing to admit proper evidence. Loren counters that the trial court's rulings on the admissibility of the evidence were correct and that, even if the trial court erred, the errors were not prejudicial.

### 1. Standard of Review

The trial court has discretion in determining whether or not evidence is admissible. *MMOE v. MJE*, 841 P.2d 820, 828 (Wyo.1992). We will reverse a trial court's decision on the admissibility of evidence only if the trial court abused its discretion. *Hodges v. State*, 904 P.2d 334, 340 (Wyo. 1995). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could [have] reasonably conclude[d] as it did." *Hilterbrand v. State*, 930 P.2d 1248, 1250 (Wyo.1997).

Our court rules and case law direct us to disregard errors that are harmless and do not affect the parties' substantial rights. W.R.C.P. 61; W.R.A.P. 9.04; W.R.E. 103; *see also Waggoner v. General Motors Corporation*, 771 P.2d 1195, 1202 (Wyo.1989). "An error warrants reversal only when it is prejudicial and it affects an appellant's substantial rights." *Candelaria v. State*, 895 P.2d 434, 439–40 (Wyo.1995). For an error to be prejudicial, it must " 'cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process' [or possess] '. . . a clear capacity to bring about an unjust result.' " *Natural Gas Processing Co. v. Hull*, 886 P.2d 1181, 1188 (Wyo.1994) (quoting *Gluckauf v. Pine Lake Beach Club, Inc.*, 78 N.J.Super. 8, 187 A.2d 357, 366 (N.J.Super.1963)). *See also Ahearn v. Tri–County Federal Savings Bank*, 948 P.2d 896, 898 (Wyo.1997).

### 2. Hearsay

The Clarks maintain that, over their objections, the trial court allowed various witnesses to testify concerning Leona's statements. They claim that these statements were inadmissible hearsay and that the admission of the statements was prejudicial to them.

At the trial, Loren related Leona's statement that she did not know where Ramona was. Loren and Ramona both testified that Leona made statements to the effect that she was not aware of how Bob was handling her funds. Ramona also testified that Leona said Bob could live in the apartment for as long as he needed to live there. Loren elicited similar testimony from one of Leona's neighbors who testified concerning the statements Leona made about her loving feelings for Bob and his right to remain in the apartment.

The Clarks contend that the admission of this testimony was prejudicial to them because the testimony showed that confidential relationships existed between Bob and Leona and between Suzanne and Leona and that Bob and Suzanne exercised undue influence over Leona. Bob and Suzanne argue further that the testimony was prejudicial because it showed that Bob was not entitled to Leona's house and that Leona did not, therefore, ratify Bernice's execution of the quitclaim deed.

■ Hearsay is defined as being "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). Hearsay generally is not admissible unless the evidence falls within a recognized exception to the hearsay rule. W.R.E. 802 to 804; *see also Owen v. State,* 902 P.2d 190, 195 (Wyo. 1995). "In the absence of a statutory provision, the death of a declarant is not in itself a ground for invoking an exception to the hearsay rule." 29A Am.Jur.2d *Evidence* § 828 at 214 (1994). Wyoming does not have a statute that makes a deceased declarant's statements admissible per se. A deceased declarant's testimony must fall within an exception to the hearsay rule in order for it to be admissible.

■ Loren's testimony that Leona stated she did not know Ramona's whereabouts was not hearsay because it was not offered for the truth of the matter being asserted. Leona's statements were not related to the jury to show that Ramona was missing but, instead, were related to show Leona's state of mind. *See Tageant v. State,*

737 P.2d 764, 766 (Wyo.1987). Much of the remainder of the testimony relating to Leona's statements was hearsay and did not fall within the recognized exceptions to the hearsay rule. The admission of the hearsay testimony, however, was harmless under the circumstances of this case.

■ The testimony concerning Leona's statements about how Bob was handling her funds shed light on the relationship between Bob and Leona. A wealth of appropriate evidence pertaining to the relationship between Bob and Leona was presented. The admission of the hearsay testimony, which simply corroborated the appropriate evidence, was, therefore, harmless. *See Kerns v. State,* 920 P.2d 632, 641 (Wyo.1996).

■ Leona's will corroborated the testimony relating to her statements that Bob was not going to get the house but that he could live in the apartment as long as he wanted to. The Clarks were not, therefore, prejudiced by its admission. Furthermore, we fail to see the significance of this testimony in light of the issues presented in the case. Bob was not entitled to the house under any circumstances. If the quitclaim deed had been declared to be valid, Suzanne and Robbie would have been the owners of the house. The trial court did not commit reversible errors when it allowed the hearsay statements to be admitted into evidence at the trial.

### 3. Testimony that Leona Appeared to Trust Suzanne

■ The Clarks maintain that the trial court erred by allowing Michelle Webber (Michelle) to testify that Leona appeared to trust Suzanne because no showing was made that Michelle had personal knowledge about that matter. They also claim that Michelle's testimony was improper opinion testimony by a lay witness. The Clarks insist that the testimony had a strong bearing on the issue of whether or not a confidential relationship existed between Suzanne and Leona and that its admission, therefore, prejudiced them. Loren argues that the testimony was appropriate.

At the trial, Loren's attorney questioned Michelle in part:

Q. Did she appear to trust Suzanne?

[THE CLARKS' ATTORNEY]: Objection, Your Honor. "Appear to trust" is vague.

THE COURT: I'll overrule.

[THE CLARKS' ATTORNEY]: Speculation.

THE COURT: I'll overrule. I'll let her answer.

A. Yes, she did trust Susie.

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." W.R.E. 602. A lay witness' "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." W.R.E. 701.

 Michelle testified that she was Leona's neighbor for a long period of time and that she frequented the house while Suzanne was caring for Leona. She knew both Leona and Suzanne well. Sufficient evidence showing that Michelle had personal knowledge of the relationship between Leona and Suzanne was, therefore, presented. She rationally based her opinion that Leona trusted Suzanne on her perception of the relationship between the two women, and her testimony was helpful to the jury because the nature of the relationship between Leona and Suzanne was at issue in the case. The evidence was, therefore, admissible. It was up to the jury to determine the weight to be given to, and the quality of, Michelle's testimony. *See Brockett v. Prater,* 675 P.2d 638, 642 (Wyo. 1984).

Furthermore, a home health care worker, who helped care for Leona, also testified that Leona appeared to trust Suzanne. Suzanne testified that Leona called on her whenever she needed something and that Leona had confidence in her. The Clarks did not complain about the admission of the home health care worker's testimony or Suzanne's testimony. We cannot see any reason, in light of the other evidence that was presented in the case, why the admission of Michelle's opinion testimony, which simply confirmed the other testimony, could have possibly been harmful to the Clarks.

### 4. *Inquiry About Loren's Choice not to Pursue Claims Against Bernice's Estate*

 The Clarks contend that the trial court erred when it refused to allow them to inquire as to why Loren abandoned his claims against Bernice's estate. Loren contends that the trial court properly excluded that evidence because it was irrelevant to the issues being presented at the trial.

Loren originally asserted claims against Bernice for fraud and breach of fiduciary duty. During the pendency of the lawsuit, Bernice died, and Loren elected not to pursue his claims against her estate. At the trial, the Clarks' counsel questioned Loren in part:

Q. And you initially claimed that Bernice was part of the—Bernice Burns was part of this conspiracy to defraud—

A. Right.

Q. —Leona, didn't you?

And you've chosen not to pursue that claim against her estate, haven't you?

A. I was instructed by [my attorney] that I had a choice to make, and that we chose to release Bernice's estate and pursue this course of action.

Q. So you're not pursuing a claim against Bernice Burns' estate, are you?

A. No.

Q. Does that mean you don't think Bernice did anything wrong?

A. (Laughing.)

[LOREN'S ATTORNEY]: Objection. Calls for legal conclusion.

THE COURT: Overruled. You may answer.

A. Yes. I think Bernice did something wrong.

Q. (BY [THE CLARKS' ATTORNEY]) But you're not bringing any claim against her in this matter, are you? Or her estate? Excuse me.

438

A. Well, again, based on advice of counsel, we had—we could choose action against her estate or against the property. And because my understanding was that we had to make a choice, we were originally concerned about the property and that's the way we chose to go.

That doesn't mean that we don't think Bernice had anything to do with it. It's simply that we made the choice that this is the way we wanted to go.

Q. You made the choice not to pursue Bernice and that's a yes or no answer.

A. Okay.

Q. And isn't it true that while Bernice was alive, you chose to pursue Bernice both as against the property and for wrongdoing?

[LOREN'S ATTORNEY]: Objection. Relevance.

THE COURT: Sustained.

[LOREN'S ATTORNEY]: I don't know what that's got to do with this case.

THE COURT: Sustained.

[THE CLARKS' ATTORNEY]: Your Honor, I would submit that it is relevant to the extent that he has said that he now is not pursuing Bernice because he has to make a choice, and at least at one time he did not make that same choice when she was alive.

THE COURT: I'm still sustaining the objection. Your objection is on the record.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. Relevant evidence is generally admissible, and evidence that is not relevant is not admissible. W.R.E. 402.

The Clarks argue that the trial court should have allowed the evidence to be admitted because it was relevant to the issue of whether or not Bernice wrongfully exceeded her authority as Leona's attorney in fact. We do not see how questioning Loren about his procedural choices would have assisted the jury in determining the issues before it. The Clarks have not convinced us that the evidence was relevant, and the trial court did not, therefore, abuse its discretion by refusing to allow the Clarks to continue with that line of questioning.

**B. Money Judgments—Case No. 97–313**

In Case No. 97–313, Loren claims that the jury improperly awarded Bob and Suzanne money judgments for the services they had rendered to Leona during her lifetime. He contends that the judgments were contrary to law and that sufficient evidence did not support the jury's awards. Bob and Suzanne argue that they were entitled to the damages awards under the doctrine of unjust enrichment.

The standard for reviewing the sufficiency of the evidence is well established. On review, this court assumes that the evidence in favor of the successful party is true. We leave out of consideration entirely the evidence presented by the unsuccessful party that conflicts with the evidence of the successful party, and we afford to the evidence of the successful party every favorable inference that may be reasonably and fairly drawn from it.

*Kadrmas v. Valley West Homeowner's Association,* 848 P.2d 826, 828 (Wyo.1993) (citation omitted). *See also Turcq v. Shanahan,* 950 P.2d 47, 51–52 (Wyo.1997). The doctrine of unjust enrichment, or *quantum meruit,* allows for the recovery of damages on a contract that has been implied in equity. *Eisele v. Rice,* 948 P.2d 1360, 1364 (Wyo. 1997).

"The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition

to public policy, either directly or indirectly."

*R.O. Corporation v. John H. Bell Iron Mountain Ranch Company,* 781 P.2d 910, 912 (Wyo.1989) (emphasis omitted) (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* § 3 at 945 (1973)). *See also Coones v. Federal Deposit Insurance Corporation,* 894 P.2d 613, 617 (Wyo.1995).

▮ In order to prevail under the unjust enrichment doctrine, a party must prove that:

"1) Valuable services were rendered, or materials furnished,

"2) to the party to be charged,

"3) which services or materials were accepted, used and enjoyed by the party, and

"4) under such circumstances which reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched."

*Pancratz Company, Inc. v. Kloefkorn–Ballard Construction/Development, Inc.,* 720 P.2d 906, 908 (Wyo.1986) (quoting *Montes v. Naismith and Trevino Construction Company,* 459 S.W.2d 691, 694 (Tex.Ct.App.1970)). *See also Adkins v. Lawson,* 892 P.2d 128, 131 (Wyo.1995). Services that have been rendered by one family member to another family member are presumed to have been gratuitous and are not generally compensable. *Logan v. Logan,* 23 Kan.App.2d 920, 937 P.2d 967, 976 (Kan.Ct.App.1997); *see also Adkins,* 892 P.2d at 131; *Pool v. Pool,* 21 Wyo. 435, 133 P. 372, 373 (Wyo.1913).

"In order for one member of a family to recover against the estate of another member for services rendered the decedent in his lifetime, the claimant must show either that an express contract for remuneration existed or that the circumstances under which the services were rendered were such as to exhibit a reasonable and proper

expectation that there would be compensation...." *In re Estate of Rogers,* 184 Kan. 24, Syl. P 1, 334 P.2d 830 (1959).

*Logan,* 937 P.2d at 976. The Wyoming Supreme Court has defined a family as being "a number of persons composing one household and generally speaking hav[ing] one domestic government, the members thereof having reciprocal, natural or moral duties to support and care for one another." *Castor v. Rice,* 71 Wyo. 99, 254 P.2d 189, 191 (Wyo.1953).

▮ Bob and Suzanne insist that they were not members of Leona's family. The record simply does not support their contentions. Bob, Suzanne, and Leona lived together on Leona's property. Although Bob did not actually live in Leona's house, he lived in an apartment in her garage. They spent their free time with one another and took meals together. Bob and Suzanne moved freely about the house, and they both called Leona "Grandma." Although Bob and Suzanne did chores and took care of Leona's property, they did not pay rent for their housing. This evidence clearly shows that Bob, Suzanne, and Leona all lived together as a family in one household. We, therefore, presume that Bob's and Suzanne's services to Leona were gratuitous. They must prove that an express contract existed between them and Leona or that they had a reasonable expectation of being paid for their services. *Logan,* 937 P.2d at 976.

▮ Bob asserted that he was entitled to be paid $115,656 for the services he had rendered to Leona from the time he left Chicago in 1992 until Leona died in December 1995. He stated that Leona told him that she would "pay [him] consideration" for his services.[1] Bob claimed that he spent ten hours per day, seven days per week caring for Leona and her property in 1992. He testified that his working hours increased as time passed: "By January 1993 I was spending at least 12 to 13 hours a day, and she was requiring me to do a great many more

---

**1.** Loren argues that the dead man statute (Wyo. Stat. § 1–12–102 (1997)) precluded a judgment from being entered against Leona's estate solely on the basis of uncorroborated testimony from Bob and Suzanne because they were adverse parties. He did not, however, present this argu-

ment to the trial court. Accordingly, we will not consider his argument for the first time on appeal. *See McCormick v. McCormick,* 926 P.2d 360, 363–64 (Wyo.1996); *see also Castor,* 254 P.2d at 192.

chores. And I had to spend 16 hours a day to care for her." Bob stated that he believed a wage of six dollars an hour was "more than fair" for the services he had provided to Leona. He admitted, however, that Leona did not offer to pay him six dollars per hour and that he did not keep records of the hours he actually spent working for Leona.

Suzanne testified that she was entitled to be paid $25,776 for the time she spent caring for Leona from July 1, 1995, until Leona died in December of that year. She stated that her grandmother told her that she would be "greatly rewarded monetarily" for her services. Suzanne maintained that she cared for Leona twenty-four hours a day, seven days per week during that time and that her services were worth six dollars per hour. She did not, however, present a record of the time she spent caring for Leona, and evidence showing that Suzanne did not provide constant care to her grandmother during that time was admitted during the trial. Michelle testified that she picked up Suzanne two times per week and that they went out in the evenings.

Bob and Suzanne did not testify about any agreement they had with Leona regarding the compensation they were to be paid or when the payments were to be made. Evidence showing that Leona paid other people who provided services to her was presented at the trial, but no evidence suggesting that she ever paid Bob or Suzanne direct compensation for their services was presented. Furthermore, neither Bob nor Suzanne requested payment from Ramona after she was appointed the conservator of Leona's estate. Although Leona had the opportunity to change her will to provide compensation for Bob and Suzanne, she did not do so. The evidence presented at the trial did not establish that an agreement existed for Bob and Suzanne to be compensated for their services to Leona or that Bob and Suzanne could have reasonably and properly expected to be compensated.

Additionally, adequate evidence was not presented to establish that six dollars per hour was reasonable compensation for the services Suzanne and Bob had performed.

Suzanne testified that six dollars per hour was "the same rate as what a girl doing the type of duties I was doing would get." She did not embellish on her statement or otherwise present evidence to establish that six dollars per hour was a reasonable wage for caring for an elderly person and her home. Bob testified that six dollars per hour was "more than fair" but did not present an objective basis for that statement.

The Clarks' attorney admitted in his closing argument that the amounts sought by Bob and Suzanne were "a little too much" for the services they had rendered to Leona. He suggested, instead, that a reasonable amount for Suzanne's and Bob's services would be the remaining value of the estate. The jury acted on the attorney's suggestion and split the estate between Suzanne and Bob.

There was simply no rational basis for the jury's decision, and we cannot allow it to stand. Even under our lenient standard of review, the evidence in this case was not sufficient to support the jury's verdict. The evidence is clear that Bob and Suzanne cared for Leona out of love and respect for her. It was certainly admirable for them to show such a kindness to Leona. Bob and Suzanne were not, however, entitled to be compensated for that kindness.

## CONCLUSION

We hold that the trial court did not commit reversible errors in its rulings on the admissibility of the evidence presented at the trial. We further hold that sufficient evidence did not support the jury's awards and that the money judgments entered in favor of Bob and Suzanne were contrary to law.

Affirmed in part, reversed in part, and remanded for the entry of an order that is consistent with this opinion.