(937 P.2d 967)
No. 76,803

Raymond E. Logan, Individually and as Executor of the Estates of Robert E. Logan and Ruth J. Logan, Deceased, *Appellee*, v. Bobby L. Logan and Margie S. Logan, *Appellants*.

Opinion filed May 2, 1997.

*Lawrence R. Uri, Jr.*, of Swenson, Vernon, Retter, Uri, Brewer & Long, Chartered, of Concordia, for appellants.

*Curtis A. Frasier* and *Guy R. Steier*, of Frasier & Steier, of Beloit, for appellee.

Before GERNON, P.J., ROYSE and MARQUARDT, JJ.

MARQUARDT, J.: Bobby L. Logan and Margie S. Logan, husband and wife, appeal the district court's ruling to set aside transfers of property that they received from Robert E. Logan and Ruth J. Logan, Bobby's father and mother.

Robert and Ruth had two sons, Bobby and Raymond. In April 1992, Robert and Ruth, who were in their 80's, left their home in Kansas to stay with Bobby and Margie in Illinois. Aside from a

brief return to their home in Kansas, the elder Logans lived with Bobby and Margie until their deaths in July 1993.

Approximately 2 months after Robert and Ruth moved to Illinois, they transferred almost all of their assets to Bobby and Margie, who maintain that the transfers were gifts.

Raymond, as executor of his parents' estates, learned of the transfers after their deaths. Raymond maintains that Bobby and Margie coerced Robert and Ruth to make the transfers. Raymond filed a lawsuit to have the transfers set aside or, in the alternative, to have a constructive trust placed on his parents' assets, so that the assets would be distributed according to their wills. Bobby and Margie counterclaimed, seeking reimbursement for funeral expenses, payment for services and expenses incurred while caring for Robert and Ruth, and payment for storage of the elder Logans' property after their deaths.

The trial court found that a confidential, fiduciary relationship had existed between Bobby and Margie and the elder Logans and that the relationship had been breached. The trial court also found that Robert and Ruth were both susceptible to undue influence by Bobby and Margie; that Robert did not possess the requisite capacity to make the transfers; that Bobby and Margie failed to show that the transfers were made in good faith, for valuable consideration, and without undue influence; and that even if the transfers were made in good faith, a constructive trust should be placed on the transferred property. The trial court set aside the warranty deed, which conveyed the parents' homestead in Beloit, and entered judgment in favor of Raymond for $97,376.57. Bobby and Margie were awarded an off-set on the judgment for $11,997.58.

Raymond filed a motion for punitive damages. The trial court granted the motion, awarding Raymond $80,000. Bobby and Margie appeal.

## CONFIDENTIAL RELATIONSHIP

Bobby and Margie argue that there was not substantial evidence to support the trial court's finding that a confidential relationship existed between themselves and Robert and Ruth.

"The determination of whether a confidential relationship existed was one of fact and our scope of review is to ascertain whether there is substantial competent evidence to support the findings of the trial court. [Citation omitted.] Further, we are required to consider the evidence in its most favorable aspect in relation to the party who prevailed in the court below. [Citation omitted.]" *Curtis v. Freden*, 224 Kan. 646, 652, 585 P.2d 993 (1978).

Bobby and Margie rely on *Curtis*, where the court found that no confidential relationship existed. However, *Curtis* is factually different from the instant case in that the mother transferred an 80-acre farm to one of her three children because that son and his wife had taken care of her for many years; the mother did not live with the son; the mother had told others that she was going to make the transfer long before the deed was signed; and there were no other transfers of property to the son and his wife. See, *e.g.*, *Nelson, Administrator v. Dague*, 194 Kan. 195, 197, 398 P.2d 268 (1965); *Staab v. Staab*, 160 Kan. 417, 422, 163 P.2d 418 (1945).

In this case, Ruth and Robert had lived in Bobby's home for a period of just over a year and had depended on Bobby and Margie for making most of Robert's medical arrangements, including transfers to various hospitals and nursing homes. Bobby had contacted his parents' attorney, directing the preparation of the powers of attorney in his favor and the deed, which gave him and Margie his parents' home. At Bobby's direction, his parents' bank cashed Ruth's and Robert's certificates of deposit. Ruth had written a letter to her sister, which said that she and Robert wanted to return to their home in Kansas, but that Bobby and Margie insisted that they stay with them. Ruth had also told Raymond that she wanted to return to Kansas, but that Bobby had left her no choice in the matter. At that time, Ruth was under a lot of stress and overwhelmed by Robert's confused and disoriented condition. Bobby testified that Ruth needed his and Margie's help during the time that she was making the transfers. Some 6 months or so after arriving in Illinois, Ruth became very ill and was hospitalized. Ruth had told Raymond that Bobby was putting considerable pressure on her to transfer assets.

From the evidence, it is clear that Ruth and Robert were subjected to Bobby's and Margie's decisions at a time when they were

weak due to illness and stress. The evidence supports the trial court's finding that Bobby and Margie were in a confidential relationship with Robert and Ruth.

## UNDUE INFLUENCE

Bobby and Margie next argue that there was not substantial evidence to support the trial court's finding that they had exerted undue influence on Robert and Ruth to make the various transfers to them.

Once a confidential or fiduciary relationship is found, the burden shifts to the party who is the beneficiary of the transfer to show that the transfer was made in good faith and without undue influence.

" 'The test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which may be determined from all the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting.' " *Frame, Administrator v. Bauman*, 202 Kan. 461, 468, 449 P.2d 525 (1969) (quoting *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 [1968]).

"This court has held a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that an individual occupies a confidential or fiduciary relation with another. Such a presumption is raised and the burden of proof shifted, however, when, in addition to the confidential relation, there exist suspicious circumstances." *In re Adoption of Irons*, 235 Kan. 540, 547, 684 P.2d 332 (1984).

Bobby and Margie argue that there were no suspicious circumstances related to the transfers from Ruth and Robert; however, the trial court found otherwise. Robert and Ruth each had wills that, aside from a small gift to their granddaughter, left all of their assets to each other and then to their two sons in equal shares. Bobby could not explain why his parents had transferred essentially all of their assets to him alone, contrary to their wills, other than to say that the transfers were gifts.

The transfers were made soon after Ruth and Robert had arrived in Illinois, with Bobby initiating the contacts to effect the transfers. Bobby testified that Robert signed the various documents on his

own volition; however, Robert's medical records indicate that during this time, Robert was confused and disoriented.

The elder Logans received a bank cashier's check made payable to them for the certificates that were cashed in the amount of $75,154.50. Ruth endorsed the check and gave it to Bobby. Bobby then endorsed the check and deposited it in his own checking account, without obtaining Robert's endorsement.

In June 1992, Ruth wrote Bobby two checks—one for $15,000 and one for $7,222.09. In July 1993, Ruth wrote Bobby a check for $12,000. Bobby testified that he guided Ruth's signature on this check and that he needed the money for funeral expenses; however, he did not use the money for funeral expenses, and he did not return it to the estate until 8 months later.

There is no evidence that Ruth gave Bobby these large amounts of money as payment for Robert's and her care. In fact, Ruth had written checks to Bobby in amounts between $100 and $300 about every 2 weeks while staying at his home, which totalled approximately $6,750. Bobby testified that Ruth told him that she wanted to pay her way.

Bobby never told Raymond about any of the transfers. Raymond repeatedly offered to have Ruth and Robert stay with him, but Bobby and Margie always prevented them from leaving at the last minute.

There is substantial evidence to support the trial court's finding that suspicious circumstances existed regarding the transfers and that Bobby and Margie exerted undue influence on Ruth and Robert to transfer their assets.

Bobby and Margie also argue that the deed was not the result of undue influence because Ruth and Robert received independent legal advice before executing it.

The purpose of the independent advice rule was stated in *In re Estate of Carlson*, 201 Kan. 635, Syl. ¶ 5, 443 P.2d 339 (1968):

"The requirement of independent advice is designed to provide assurance that the aged or infirmed or otherwise dependent person conferring the benefit knew what he was doing and did it of his own free act and will, and to see that no undue advantage was taken of him."

Ruth and Robert's long-time attorney, Raymond Stein, testified that Bobby and Ruth came to his office in early July 1992. During their meeting, Bobby did most of the talking, giving instructions to Stein on how to prepare the deed. Neither Bobby nor Ruth asked for Stein's advice on the transfer. In fact, Stein testified that Robert and Ruth "were relying more on their son Bobby's advice" than on his.

The trial court's finding that Robert and Ruth did not receive independent legal counsel is supported by substantial evidence.

## CONSTRUCTIVE TRUST

Raymond requested that the trial court set aside the deed and enter judgment in his favor in the amount of the transfers. In the alternative, Raymond requested that the trial court impose a constructive trust on the transferred assets and that the assets be distributed according to Ruth's and Robert's wills. The trial court imposed a constructive trust on all of the cash transfers, set aside the deed and the cash transfers, and entered judgment in favor of Raymond in the amount of the transfers.

In *Kampschroeder v. Kampschroeder*, 20 Kan. App. 2d 361, 364-65, 887 P.2d 1152, *rev. denied* 257 Kan. 1092 (1995), the court stated:

"A constructive trust arises ' "wherever the circumstances under which the property was acquired make it inequitable that it should be retained by the person who holds the legal title." ' [Citations omitted.]

"An essential element of proving a constructive trust is a showing of fraud. However, there are two types of fraud, actual and constructive.

'Actual fraud is an intentional fraud, and the intent to deceive is an essential element of the action. Constructive fraud, however, is a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty of purpose or intent to deceive is necessary. [Citation omitted.]' *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987).

. . . .

"Absent actual fraud, there are two additional elements which are required to be proven. First, there must be a confidential relationship. Secondly, the confidence reposed must be betrayed, or a duty imposed by the relationship must be breached."

Assuming that fraud is still a required element of constructive trusts, in the absence of such a finding, "the trial court is presumed to have found all facts necessary to support the judgment." *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 731, 915 P.2d 80 (1996).

Even if Bobby and Margie did not act with the intent to deceive, the evidence supports a finding that their acts constitute constructive fraud. The first element of the constructive fraud theory is a confidential relationship, which has already been discussed. The only remaining question, then, is whether Bobby and Margie betrayed that confidence or breached a legal duty imposed by the relationship.

About 2 months after Robert and Ruth arrived in Illinois, Raymond came to visit. During that visit, the family discussed whether Robert and Ruth should transfer their assets to Bobby and Raymond and that in the event the assets were transferred, the assets would be made available to Ruth and Robert for their medical and living expenses and would be returned to their estates after their deaths for disposition according to their wills. The purpose of this plan was to allow Robert and Ruth to receive public assistance without depleting their assets. Raymond also testified about a letter that he had written to his mother shortly thereafter, confirming the conversation that had occurred during that meeting.

Ruth was reluctant to make the transfers, but if she decided to do so, she wanted the funds to be used as the family had discussed—both Raymond and Bobby agreed to her request.

Tami Pruitt, vice president of Guaranty State Bank in Beloit, testified that Bobby told her that "[t]here was some concern on the parents having to be placed in a nursing home, and [the transfers were] done to protect the assets of the parents."

Stein testified that at the time he drafted the deed, "[Bobby] kept coming back to preserving the family assets for the benefit of the family members. . . . At the time, I thought they had a family understanding and agreement as to how the property was to be divided. I wasn't told that, but I mean, it seemed quite obvious."

In April 1993, 3 months before Robert and Ruth died, Bobby wrote Raymond a letter, which said:

"Before [Robert and Ruth] can get on Medicaid—all their assets in general—must be used up. Any asset not disposed of thirty months prior to seeking Medicaid status can be drawn upon according to law.

"Marge and I have been trying to both: care for dad and mom, and *to protect the assets*. We have, however, reached the point of exhaustion.

"I would like you to seriously consider taking the both of them into your home and care for a while. We must have a break from the care we have provided them for nearly twelve months.

"If you cannot accept them, we shall have to consider supervised nursing care which will probably devour their assets. *Should that occur, one half of what we set out to do twelve months ago will be lost, i.e., the protection of assets*." (Emphasis added.)

The evidence indicates that Ruth was transferring assets to Bobby to be used to care for Robert and her, so that the remaining assets would still be in their estates. By keeping the assets for himself, Bobby breached the duty and betrayed the confidence that Robert and Ruth had placed in him.

## ROBERT'S CAPACITY TO EXECUTE THE DEED

Bobby and Margie argue that there is no substantial competent evidence to support the trial court's finding that Robert lacked the capacity to execute the deed, contending that Robert possessed "at least testamentary capacity at the time he made the gift."

The record is replete with evidence supporting the trial court's finding that Robert lacked the capacity to execute the deed.

## THE DOCTRINE OF AFTER-ACQUIRED TITLE

Bobby and Margie next argue that even if Robert did lack the capacity to execute the deed, pursuant to K.S.A. 58-2207, the doctrine of after-acquired property applies to the deed. The trial court found that the doctrine does not apply. K.S.A. 58-2207 provides:

"Where a grantor by the terms of his or her deed undertakes to convey to the grantee an indefeasible estate in fee simple absolute, and shall not at the time of such conveyance have the legal title to the estate sought to be conveyed, but shall afterwards acquire it, the legal estate subsequently acquired by the grantor shall immediately pass to the grantee; and such conveyance shall be as effective as though such legal estate had been in the grantor at the time of conveyance."

Bobby and Margie argue that even if Robert lacked the capacity to execute the deed, he died in possession of a one-half interest in the property, which he passed to Ruth in his will. Because Ruth conveyed all of her interest in the property to Bobby and Margie through the deed, then pursuant to K.S.A. 58-2207, they contend, they now possess the entire interest in the house.

This argument is without merit and patently ignores the trial court's findings, supported by substantial competent evidence, that a confidential relationship was breached and that Bobby and Margie exercised undue influence over the elder Logans. This argument also ignores the trial court's imposition of a constructive trust based on Bobby and Margie's breach of their duty to treat Ruth's and Robert's assets in a manner consistent with a prior agreement.

## RUTH LOGAN'S AUTHORITY TO MAKE THE TRANSFERS

Bobby and Margie also argue that Ruth had the authority to make all of the cash transfers because, as a joint tenant, she had the complete power to dispose of the funds in the bank accounts. Bobby and Margie further argue that even if Ruth did not have full access to the funds, Robert left all of his assets to Ruth in his will. Under the doctrine of after-acquired title, they argue, Ruth's gifts to Bobby and Margie became valid upon Robert's death.

Again, as in the previous issue, this argument is without merit. Neither Ruth's right and title in the assets nor her authority to transfer them to Bobby and Margie is determinative in this case.

## COUNTERCLAIMS

Bobby and Margie next argue that the trial court should have found in their favor on their counterclaims, which were for services rendered and expenses incurred after Ruth's and Robert's deaths, relating to their burials and the preservation of estate assets; for services performed and expenses incurred on behalf of Robert and Ruth during their lifetimes; and for storage of estate property left at their residence after Robert and Ruth had died.

The trial court allowed Bobby and Margie $11,997.58 for services and expenses incurred after Robert's and Ruth's deaths, but

denied compensation for services and expenses incurred during their lifetimes.

Bobby and Margie argue that the trial court erred and that they should recover under the doctrines of unjust enrichment and quantum meruit.

"The basic elements of a claim based on a theory of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, Syl. ¶ 6, 910 P.2d 839 (1996).

Bobby and Margie rely on *Griffin v. Price*, 199 Kan. 649, 433 P.2d 464 (1967). In *Griffin*, however, the caretaker was not related to the decedent.

"In order for one member of a family to recover against the estate of another member for services rendered the decedent in his lifetime, the claimant must show either that an express contract for remuneration existed or that the circumstances under which the services were rendered were such as to exhibit a reasonable and proper expectation that there would be compensation (following *In re Estate of Nicholson*, 167 Kan. 14, 204 P.2d 602)." *In re Estate of Rogers*, 184 Kan. 24, Syl. ¶ 1, 334 P.2d 830 (1959).

"The rule is based upon a presumption that services rendered a member of the family are filial and gratuitous and are not to be compensated in money." *Rogers*, 184 Kan. at 28.

Here, the evidence supports the trial court's finding. Ruth left Bobby and Margie periodic checks to "pay her way." There was no evidence that Bobby and Margie had a reasonable and proper expectation of additional compensation.

## MOTION FOR RELIEF FROM JUDGMENT

Bobby and Margie argue that the trial court erred in not granting their motion for relief from judgment in which it was asserted that they had new evidence that Ruth was lucid and in good health at the time the transfers occurred.

" 'A ruling on a motion for relief from a final judgment filed pursuant to K.S.A. 60-260(b) rests within the sound discretion of

the trial court.'" *In re Marriage of Jones*, 22 Kan. App. 2d 753, 766, 921 P.2d 839, *rev. denied* 260 Kan. 993 (1996).

Bobby and Margie's newly discovered evidence was deposition testimony that was given after the trial had concluded. The deponent testified as to her knowledge of Ruth's state of mind during the time that Ruth was transferring assets to Bobby and Margie.

The trial court ruled that this evidence did not constitute newly discovered evidence, finding that the evidence was not "persuasive on the issues of [Ruth's] mental condition and the issue of undue influence given the substantial amount of evidence presented by plaintiff and defendants at the trial."

Bobby and Margie do not explain why this testimony is "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial." K.S.A. 60-260(b)(2). The deponent was Bobby and Margie's daughter-in-law.

Ruth's state of mind is relevant to this case only to the extent that it enters into the determination of whether she was in a confidential relationship with Bobby and Margie and whether Bobby and Margie exerted undue influence on her to make the transfers. As previously discussed, the evidence supports these findings. Bobby and Margie fail to show how the trial court abused its discretion in not granting their motion for relief from judgment.

## REMOVAL OF THE TRIAL JUDGE

Bobby and Margie next argue that another district judge erred in denying their motion to remove the trial judge, Judge Thomas M. Tuggle, who had "previously heard and decided a contested hearing on the admission to probate of the wills of Robert and Ruth Logan and the appointment of an executor." Bobby and Margie argue that the findings and conclusions in the journal entry in the probate case show "that the judge had already made up his mind as to all the crucial issues" in the present case.

K.S.A. 20-311d provides the procedure for disqualifying a judge.

"Previous rulings of a trial judge, although numerous and erroneous, are not alone sufficient to show the required bias or prejudice to disqualify a judge under [K.S.A. 20-311d]. Such rulings are subject to review and correction on appeal and will not justify

disqualification." *State ex rel. Miller v. Richardson*, 229 Kan. 234, 238, 623 P.2d 1317 (1981); see K.S.A. 20-311d(d).

The affidavit was ruled to be insufficient because "[t]he recital of previous rulings or decisions by the judge . . . cannot be a proper basis for disqualification," and it did not demonstrate "personal bias or prejudice by the judge."

"[T]he affidavit must contain facts and reasons which give fair support for the belief that on account of the bias or prejudice of the judge the affiant cannot obtain a fair trial." *Hulme v. Woleslagel*, 208 Kan. 385, 392, 493 P.2d 541 (1972). Where the allegations in the affidavit are speculations only, they do not reach the threshold necessary to sustain the motion. See *State v. Goss*, 245 Kan. 189, 198, 777 P.2d 781 (1989).

The statements contained in the affidavit do not support the belief that in the present case Judge Tuggle would not make further factual findings supported by the evidence and that he would not form fair and correct legal conclusions.

## AMENDMENT TO THE PETITION TO INCLUDE PUNITIVE DAMAGES

Bobby and Margie argue that the trial court erred in granting Raymond's motion to amend his petition to include punitive damages, contending that the trial court should have denied the motion because it was not accompanied by a supporting affidavit as required under K.S.A. 60-3703.

Raymond timely filed a motion to amend his petition to include punitive damages. The pretrial order notes that Bobby and Margie objected to that motion because no supporting affidavit had been filed with the motion. The trial court found that "there is no undue burden or surprise on the defendant and the motion is timely filed. Plaintiff is granted ten (10) days to file supporting affidavits. Defendant shall have ten (10) days to respond with affidavits."

Bobby and Margie raised the issue again prior to trial, arguing that the affidavit filed was insufficient because it was signed by counsel rather than by Raymond. The trial court stated that under the facts of the case, Raymond should not be precluded from

amending his petition and that the court would take the matter under advisement.

Raymond's counsel then said,

"Just a brief comment. First, in relation to the affidavit itself, as the Court may recall at the pretrial, there was discussion that the reason that it was impossible to file an affidavit at this point is due to the facts that needed to be alleged in the affidavit were still being transcribed by the reporter, and therefore, you know, reference could not be made to that, and the affidavits followed after—after that transcription was received and that documentation was made."

The trial court distinguished *Sullwold v. Barcus*, 17 Kan. App. 2d 410, 838 P.2d 908, *rev. denied* 251 Kan. 942 (1992), from the instant case, finding that under *Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, 853 P.2d 1175 (1993), Raymond had substantially complied with K.S.A. 60-3703. The trial court subsequently awarded Raymond $80,000 in punitive damages.

Bobby and Margie correctly argue that *Sullwold* concluded that "the affidavit in support of the motion to amend must be filed with the motion and served upon each of the parties." 17 Kan. App. 2d at 414. In *Sullwold*, the plaintiff contended that her attorney presented a supporting affidavit at the hearing on the motion; however, no such affidavit was included in the record on appeal. Thereupon, this court concluded: "A motion to amend with a supporting affidavit attached was never filed with the trial court." 17 Kan. App. 2d at 417.

The *Sullwold* court went on to say that "[n]o notice of the hearing scheduled for January 20, 1989, was given as required. Barcus was not served with the petition until January 24, 1989, four days after the motion was granted. The record does not reflect Barcus was served with the motion and supporting affidavit." 17 Kan. App. 2d at 415.

Here, Bobby and Margie were served with a copy of the motion. On the same day that the motion was filed, the trial court ordered that Raymond file his affidavit within 10 days; the affidavit was filed 5 days later.

K.S.A. 60-3703 requires that a *motion* to amend a petition to allow a claim for punitive damages be filed on or before the date

of the pretrial; however, the statute does not require a simultaneous filing of the affidavit. If a motion to amend the petition to allow punitive damages is timely filed and good cause is given for a delay in filing the supporting affidavit, the trial court may grant a reasonable time for the affidavit to be filed.

Raymond timely filed the motion to amend the petition but could not file the supporting affidavit until the court reporter finished a transcript on which the affidavit would rely. The trial court found no prejudice to Bobby and Margie in allowing Raymond an additional 10 days to file the affidavit. The affidavit was filed 5 days after the filing of the motion. We find no error in the trial court allowing Raymond additional time to file the affidavit.

Bobby and Margie state in their brief that the affidavit was signed by Raymond's attorney rather than by Raymond; however, they do not make a claim of error on this fact and provide no argument on the issue. This argument is, therefore, deemed abandoned. See *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371 (1994).

Affirmed.