NOT DESIGNATED FOR PUBLICATION

No. 115,821

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the
ESTATE of CROCKETT A. PROFFITT.

MEMORANDUM OPINION

Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed May 19, 2017. Affirmed.

*Nathanael W. Berg* and *Lee A. Legleiter*, of Hampton & Royce, L.C., of Salina, for appellants Jennifer Crawford and Spencer Proffitt.

*Toby Crouse*, of Foulston Siefkin LLP, of Overland Park, *Jeremy Graber*, of the same firm, of Topeka, and *Mikel L. Stout*, of the same firm, of Wichita, for appellee Robin Proffitt.

Before LEBEN, P.J., PIERRON and BRUNS, JJ.

*Per Curiam*: Crockett "Cap" Proffitt and Robin Proffitt (Appellee) were married in 2004. Cap had two adult children from a previous marriage, Spencer Proffitt and Jennifer Crawford (Appellants). Appellee also had two adult children from a previous marriage, Casey Pohlman and Karlene Jeppesen. Cap died intestate on March 16, 2014. A little more than a year later, Appellee brought claims against Cap's estate for breach of contract, unjust enrichment, estoppel, and constructive fraud, claiming she had an agreement with Cap that he would leave his entire estate to her. Appellants objected to her request and moved for summary judgment, claiming the nonclaim statute barred Appellee's nontort claim and the facts did not support her constructive fraud claim. The district court granted summary judgment in part, finding Appellee's nontort claims were untimely under the nonclaim statute. The court also found, however, factual issues regarding Appellee's constructive fraud claim, and the case went to a bench trial. In its

1

decision, the court found clear and convincing evidence supported Appellee's constructive fraud claim and the claim was not untimely under the nonclaim statute. Therefore, the court ordered Cap's estate to go to Appellee. Appellants appeal.

At the time of Cap's death, he and Appellee owned a home, several bank accounts, and numerous vehicles as joint assets. Their home was valued at $280,000 with a $214,492 mortgage. Their bank accounts held $174,222.73. Their vehicles and equipment totaled $99,700. Cap had a retirement account worth $283,636.21. He held approximately $900,000 in ILS stocks in his own name, as well as approximately $15,000 NACADO stocks. He also had a relatively small amount of personal property.

On April 22, 2014, Appellee's attorney sent a letter to Appellants regarding Cap's estate. The letter explained that Cap had wanted his entire estate to go to Appellee. Because he died intestate, however, the estate would be split evenly between Appellee and Appellants by operation of law. The letter requested a meeting to make an agreement allowing Cap's entire estate to go to Appellee.

Appellee filed a petition for appointment of an administrator on May 23, 2014. She requested the district court appoint her as administrator without bond. For three consecutive weeks, starting on May 29, 2014, and ending on June 12, 2014, Appellee published a notice of hearing in the Great Bend Tribune. On June 23, 2014, the court appointed Appellee administrator of Cap's estate. Appellee filed a petition for homestead allowance of $50,000 and a petition for a partial disbursement of $100,000. The court granted both petitions.

On May 1, 2015, almost a year after the district court appointed her administrator, Appellee filed a petition for allowance of demands. She requested payment of $949,150.51, covering the value of Cap's stocks. She brought claims for breach of contract, unjust enrichment, estoppel, and constructive fraud, arguing she had put substantial assets into the marriage based on an agreement that Cap would leave his entire

2

estate to her. Appellants objected, arguing the nonclaim statute, K.S.A. 59-2239, barred Appellee's claims.

On December 17, 2015, Appellants filed a motion for summary judgment, arguing the nonclaim statute barred Appellee's nontort claims. They also argued the facts did not support Appellee's constructive fraud claim. They claimed Cap and Appellee did not have an agreement regarding distribution of assets after his death. Additionally, they asserted the statute of limitations for fraud, K.S.A. 60-513, barred this claim.

On January 19, 2016, Appellee filed a response to Appellants' motion for summary judgment. She argued she received written notice from her own attorney in April 2015 and filed all her claims within 30 days. Furthermore, fact issues still existed regarding her constructive fraud claim, so summary judgment would not be appropriate on that issue.

The district court granted Appellants' motion in part, dismissing all of Appellee's claims except her constructive fraud claim. The court found the nonclaim statute barred her nontort claims. The court noted that Appellee was both an administrator and a creditor. Therefore, she had a duty to send notice to any known creditors, including herself but had failed to do so. She could not wait until another party sent her notice and then claim she did not receive actual notice until that time. The court held, however, that factual disputes remained as to the constructive fraud claim.

The district court held a bench trial on March 24, 2016. Appellee testified regarding her financial situation prior to her marriage to Cap. She had gone through a divorce in 2002. In the settlement, she received $200,000 for the marital residence and $25,000 in lieu of her ex-husband's retirement account.

Appellee testified she had last worked in 1988 as a border inspector for U.S. Customs Service in Montana. She also volunteered as a first responder. In November 1988, a drunk driver hit Appellee while she was assisting at the scene of a car accident.

3

She received a $400,000 settlement as a result of the accident, distributed in monthly payments of $647.21 and two lump-sum payments of $40,000 in 2009 and 2010. Since then, she had been unable to work and received Social Security disability benefits of approximately $500 a month at the time of her marriage to Cap.

Appellee testified about Cap's financial situation prior to their marriage. She stated that Cap had been previously married to Karen Proffitt. In the divorce settlement, Karen received the house, proceeds from Cap's 401K, a vehicle, and a cash payment of $36,015. She also received an additional sum of $168,977, payable in five yearly installments, and maintenance of $1,350 per month for 10 years. Cap received stock in Thomas County Feeders, stock in Barton County Feeders, and an ultra-light aircraft. He also assumed the debt for the vehicle given to Karen.

According to Appellee, Cap was not doing well financially when the two met. He had encumbered stock, an aircraft worth $18,500, and a job as manager and part-owner of Barton County Feeders. He was bouncing checks for small purchases until Appellee began depositing her disability payments into his checking account.

Appellee moved to Great Bend and Ellinwood shortly before she married Cap on May 15, 2004. Prior to their marriage, they discussed their financial situations and divorce settlements. She testified that prior to their marriage, she and Cap had discussed what would happen when one or both of them died, and they discussed it pretty often during their marriage. According to Appellee, the couple agreed that if one of them died, everything would go to the surviving spouse. If both of them died, everything would be sold and divided four ways among their four children. Appellee stated the agreement covered all their property.

Appellee testified they made this agreement because they did not want their children to fight over their property. When Appellee's father passed, her siblings had fought over his property. Cap had told Appellee that something similar happened in his

4

family when his grandmother died. According to Appellee, neither of them wanted their children to go through what they had gone through.

Appellee testified she and Cap discussed how they would arrange their finances before they got married. According to Appellee, Cap wanted a "team member," and the moment they were married they joined everything except Cap's stock. She explained that when they married, Cap had just been through a divorce, and he had not transferred the stock yet. Transferring the stock was not a big priority, because "everybody was gone from our lives. . . . And it was just Cap and I."

Appellee stated her disability and settlement payments went into their joint account. Cap paid his obligations to his ex-wife out of the joint account and with Appellee's money. Cap had also borrowed money against his own stock in Barton County Feeders in order to buy into Thomas County Feeders. Appellee used the money she received for the marital residence in her divorce to pay off Cap's loan against Barton County Feeders in the amount of $179,915.52. Thomas County Feeders and Barton County Feeders later merged to form ILS. According to Appellee, they had used her money to buy $10,000 of stock in NACADO, a company that produced all natural dog food, and to pay down debt on their collector cars, which they held in joint tenancy.

Appellee testified Cap never had a will during their marriage because he did not like paying for lawyers. There is a certain irony in that. According to Appellee, while Cap was in the hospital he called Randy Henry, a lawyer, to draft a will and told Henry that everything would go to Appellee. She recalled a conversation that occurred at the hospital during the last month of Cap's life. Cap told Appellee, Appellee's daughter Casey, and Appellants that he did not want any fighting and everything should go to Appellee.

Appellee testified that a week before trial she executed a will. The will stated her property should be divided equally among her two children and the Appellants upon her

5

death. However, if Appellants received a portion of Cap's estate, their share would be reduced.

Dawn Demorest, Appellee's younger sister, testified she had a conversation with Cap and Appellee about what would happen if either of them died. The three were together because Appellee and Dawn's mother was not doing well, and they wanted to make arrangements for her passing. Dawn stated that Cap told her that if he passed away, everything he had should go to Appellee. Appellee also said that if she passed, everything she had should go to Cap. If both of them passed, everything should be sold and divided equally between their four children.

Casey testified she had similar discussions with Cap and Appellee. She had moved in with them in 2006 for a year and half. According to Casey, the couple wanted everything to go to the surviving spouse if either of them passed away. If they both passed away, everything should be liquidated and divided among the four children. Casey testified that the topic had come up because she was going through a divorce at the time, and they remembered what her family had gone through when Appellee's father died. The three of them had similar conversations more than once during the time that she lived with Appellee and Cap.

Casey recalled having a conversation about Cap and Appellee's assets while Cap was in the hospital in November 2013. Cap told Casey, Appellee, and Appellants that if anything happened, he wanted everything to go to Appellee. If anything ever happened to Appellee, everything should be split between the four children.

Henry testified that on March 13, 2014, he talked to Cap on the phone for 10 to 15 minutes about preparing a will. Cap told him he wanted Appellee to have his estate. Henry thought Cap would be better off setting up a trust rather than preparing a will. He discussed the two options with Cap, but he felt that they did not make a decision either way at that time. He recommended Cap make a list of his assets, and they would go from

there. They did not discuss who would be the trustee of any potential trust or for how long he wanted Appellee to have his estate. Henry stated the only specific information he got from Cap was that he wanted Appellee to be his beneficiary.

Henry testified he did not know how sick Cap was at the time. He did not get enough information from Cap during the phone call to prepare a document. Cap passed a few days later, and Henry was never able to prepare a will.

Spencer testified that he remembered a conversation with Cap at the hospital after Cap's condition had suddenly worsened. He, Appellee, Jennifer, and Casey were all there. According to Spencer, Cap said, "I just want everything like we talked about," and he was "kind of looking at [Appellee]" when he said it. Spencer told Cap he did not really want to talk about it. Cap also said something about not wanting any fighting, but Spencer did not know what he was talking about at the time. Spencer testified it was clear Appellee and Cap had a discussion at some point, but he did not know the specifics of it.

Spencer testified that Cap had never told him about an agreement with Appellee. He did recall one time when Cap had told him that Appellee brought some money to the marriage and "what's mine is mine and what's [Appellee's] is [Appellee's]." According to Spencer, the comment was out of character for Cap, and he made it "out of the blue." Spencer felt uncomfortable with the topic, and he did not further pursue the matter at the time.

Jennifer testified she was at the hospital with Spencer, Appellee, and Casey. Cap told them, "I want things like we talked about." She did not know what Cap had talked about, but she agreed with Spencer that it was not the appropriate time to talk about it. Other than that, Cap had never mentioned an agreement with Appellee to Jennifer.

In its memorandum, the district court identified two issues: (1) whether the evidence supported a finding of constructive fraud; and (2) whether the nonclaim statute

7

barred Appellee's constructive fraud claim. As to the first issue, the district court stated Appellee needed to establish by clear and convincing evidence that she had a confidential relationship with Cap and Cap had breached his legal or equitable duties arising out of that relationship. The court found a confidential relationship existed between Appellee and Cap. The court noted the parties had been married for 10 years, and while marriage alone was not enough to give rise to a confidential relationship, the couple trusted each other to carry out their agreement. Appellee also relied to some extent on Cap because he handled their business affairs. Appellee contributed substantial assets to the marriage which benefitted both parties. Because Appellee was injured and unable to work, she relied on the income generated during their marriage. Based on this evidence, the court found Appellee and Cap had a confidential relationship.

Next, the district court addressed whether Cap had breached any duty to Appellee by failing to execute a will leaving his entire estate to her. The court found the evidence demonstrated that Appellee and Cap had an agreement as to how their assets should be distributed upon either's death. The evidence showed they had discussed this arrangement before their marriage, during their marriage, and shortly before Cap passed away. Appellee, Dawn, Casey, and Henry all testified to the existence of such an agreement. Appellee relied on this promise in bringing her assets into the marriage. The court found that Cap violated his equitable duty by not preparing a will that would leave everything to Appellee.

The district court then addressed whether the nonclaim statute barred Appellee's constructive fraud claim. Based on a review of Kansas caselaw, including *Nelson v. Nelson*, 288 Kan. 570, 205 P.3d 715 (2009), and *Salvation Army v. Estate of Pryor*, 1 Kan. App. 2d 592, 570 P.2d 1380 (1977), the court held the nonclaim statute did not bar Appellee's constructive fraud claim. The court also explicitly rejected Appellants' argument that Appellee's constructive fraud claim was only a ploy to get around the nonclaim statute.

8

Based on these rulings, the district court ordered all of Cap's estate to go to Appellee. The court added, however, that upon Appellee's death, all property should be sold and divided equal between the four children. If Appellee attempted to alter her agreement to do so in any way, that agreement would be unenforceable.

On appeal, the appellants argue that a constructive fraud claim based on a breach of contract is in essence a contract claim and subject to the nonclaim statute. They contend this is because Kansas caselaw holds equitable remedies are not available if there is an adequate remedy at law. Furthermore, according to Appellants, Kansas courts do not treat all constructive fraud claims equally, and those that are based on a breach of contract are treated as contract claims. They claim that because Appellee's constructive fraud claim was primarily based on Cap's breach of an agreement to leave property, she had to bring the claim within the time limits of the nonclaim statute. Appellants contend Appellee's claim is now barred because she failed to do so.

Appellee argues Kansas courts have long permitted recovery on a constructive fraud claim as long as a litigant is able to establish the elements of constructive fraud by clear and convincing evidence. She contends K.S.A. 59-2239 provides an exception for fraud and other torts. She asserts Appellants have also failed to support their argument with pertinent authority. Finally, Appellee argues her constructive fraud claim is permissible, even if it involves a breach of contract, because Kansas law permits contract claims and independent torts to proceed simultaneously.

*Standard of Review*

The district court's order includes both factual findings and legal conclusions. When reviewing a mixed question of fact and law, we apply a bifurcated review standard. We review the district court's factual findings for substantial competent evidence. A district court's conclusions of law based on those facts are subject to unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014); see also

9

*Kampschroeder v. Kampschroeder*, 20 Kan. App. 2d 361, 367, 887 P.2d 1152 (1995) (reviewing order in probate case under bifurcated standard). To the extent this issue requires statutory interpretation, our review is unlimited. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

*Whether the Issue Was Raised Below*

Appellee contends Appellants did not argue to the district court that the nonclaim statute barred her constructive fraud claim and she had an adequate remedy at law in breach of contract. Appellants raised both issues in their trial brief and in closing argument at the trial. Additionally, in its order, the district court noted that part of Appellants' argument was that Appellee could not bring a constructive fraud claim because "she had an adequate remedy at law and it is now barred by the non-claim statute." Appellants raised this issue below, and it is properly before us.

*Constructive Fraud and the Nonclaim Statute*

Kansas law establishes that fraud claims are not subject to the nonclaim statute. Under K.S.A. 59-2239, the nonclaim statute, any party bringing a claim against a decedent's estate must do so within the later of: (1) 4 months from the date of first publication of notice; or (2) 30 days after actual notice if the identity of a creditor is known or reasonably ascertainable. K.S.A. 59-2239(1). The statute generally bars any claim against the estate not brought within this time period. K.S.A. 59-2239(1).

The nonclaim statute provides an exception for tort claims. K.S.A. 59-2239(2); see also *Nelson*, 288 Kan. at 592 (noting exception for torts, including fraud, in K.S.A. 59-2239[2]). Those claims must be brought within the applicable statute of limitations for that particular tort. K.S.A. 59-2239(2). Kansas courts have also held the nonclaim statute is inapplicable if a court finds fraud or other unconscionable conduct. *In re Estate of*

*Reynolds*, 266 Kan. 449, 456, 970 P.2d 537 (1998); *Salvation Army*, 1 Kan. App. 2d at 601.

Because Appellee brought a fraud claim, she contends her claim was not subject to the nonclaim statute. Rather, it was subject to the statute of limitations for fraud, which is 2 years. K.S.A. 60-513. Cap died intestate on March 16, 2014. Appellee brought her claim for fraud a little more than 1 year later on May 1, 2015. Thus, she states she was well within the applicable statute of limitations.

Appellants admit the nonclaim statute does not bar constructive fraud claims. They attempt to defeat this argument by arguing that certain constructive fraud claims are distinguishable. According to Appellants, if a party bases its constructive fraud claim on a breach of contract, the claim actually sounds in contract and the nonclaim statute applies.

In support of their overall argument, Appellants first argue that constructive fraud and its primary remedy, constructive trust, are equitable in nature and are not available if there is an adequate remedy at law. They contend that because Appellee could have brought a breach of contract claim, she cannot now bring a constructive fraud claim since the nonclaim statute has run. In making this argument, Appellants do not distinguish between constructive fraud and constructive trust. They regularly cite to cases discussing constructive trusts and claim these cases promulgate rules about constructive fraud. However, the terms constructive fraud and constructive trust are not interchangeable.

Constructive fraud is a cause of action that requires "'a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty [n]or purpose or intent to deceive is necessary.' [Citation omitted.]" *Estate of Draper v. Bank of America*, 288 Kan. 510, 519, 205 P.3d 698 (2009). To succeed on a constructive fraud

11

claim, a party must also establish: "(1) a confidential relationship, and (2) a betrayal of this confidence or a breach of a duty imposed by the relationship." 288 Kan. at 519.

A constructive trust, however, is a remedy, not a cause of action. *Nelson*, 288 Kan. at 578-79. It arises where "'a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.' [Citation omitted.]" *Draper*, 288 Kan. at 518. As a remedy, a constructive trust is available even in the absence of allegations of fraud. See *Nelson*, 288 Kan. at 590 (holding constructive fraud is not exclusive basis for imposition of constructive trust).

It is worth mentioning at this point that Appellee did not request a constructive trust, nor does the district court appear to have imposed one. At the time of Appellee's petition, Cap's stocks were still within his estate. Appellee requested that the estate pay those assets to her, and the court ordered the estate to do so in its decision.

As for their argument, Appellants note that Kansas courts generally do not allow equitable remedies when there is an adequate remedy at law. They cite a number of cases for support, but these cases are not controlling in the present case. First, they are not probate cases. Second, the cases either (1) do not address constructive fraud, (2) are not Kansas cases, or (3) only stand for the proposition that a party cannot supplement a breach of contract claim based on the breach of a contractual duty with equitable remedies. See *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 242, 787 P.2d 716 (1990) (holding party must demonstrate there is reasonable probability of injury and there is not adequate remedy at law in order to obtain injunctive relief); *Rex v. Warner*, 183 Kan. 763, 769, 332 P.2d 572 (1958) (stating that courts of equity follow statutes of limitations applicable in courts of law); *Krug v. Helmerich & Payne, Inc.*, 2013 OK 104, ¶ 43, 320 P.3d 1012 (Okla. 2013) (holding plaintiffs could not recover on equitable claims based on breach of implied contractual duty after already succeeding on breach of contract claim); *Robertson v. Maney*, 196 Okla. 500, 501, 166 P.2d 106 (1946)

12

(acknowledging Oklahoma rule that "where the plaintiff has a plain, speedy and adequate remedy at law equity will not intervene in his behalf").

Appellants also argue that Kansas caselaw establishes that "constructive fraud claims seeking to enforce a contract to make a will must be brought before the running of the non-claim statute." Despite Appellants' assertions to the contrary, none of the cases they cite support this statement. For example, Appellants allege the *Nelson* court specifically held "that an attempt to bring a constructive fraud claim after the running of the non-claim statute should fail because the claim could have been brought as a breach of contract claim against the estate." Appellants cite frequently to *Nelson* to support their claim, but it is a misreading of the actual holding of this case.

In *Nelson*, a father and mother agreed, as part of their divorce property settlement agreement, that the father would execute and maintain a will creating a testamentary trust funded by his entire estate, with the income of the trust to be distributed to the couple's two children. After the father's death, the children requested a constructive trust, arguing their father violated the terms of the settlement agreement "by gifting substantial amounts of property that should have been preserved for [their] benefit and by not including his entire estate in a testamentary trust for their benefit." 288 Kan. at 573. Both the district court and the Kansas Court of Appeals denied the children's request for a constructive trust in part because the children predicated their request for a constructive trust on a breach of contract claim and the nonclaim statute had already run. 288 Kan. at 577; *Nelson v. Nelson*, 38 Kan. App. 2d 64, 162 P.3d 43 (2007).

On appeal to the Kansas Supreme Court, the children argued they were not bringing a breach of contract claim, but rather "'an action for equitable relief,'" *i.e.*, a constructive trust. 288 Kan. at 577. The court rejected this argument. It noted that a constructive trust is a remedy for unjust enrichment, not a cause of action, and, accordingly, the children had to demonstrate unjust enrichment in order to gain their requested relief. 288 Kan. at 579-81. Because prior Kansas caselaw suggested

13

constructive trusts were only available as a remedy for fraud, the children next argued that by seeking a constructive trust, they essentially alleged fraud. The court also rejected this argument, noting fraud must be pled with particularity and the children had failed to do so. 288 Kan. at 582-584. The *Nelson* court went on to hold, however, that a finding of fraud was not a prerequisite to the imposition of a constructive trust and, as a result, the children could base their request for a constructive trust on their father's breach of the settlement agreement. 288 Kan. at 584-90.

Having determined the nature of the children's cause of action, the *Nelson* court next addressed whether the nonclaim statute barred their claim. The children first argued that their claim met the tort exception in K.S.A. 59-2239(2). The court noted the children had not pled fraud or any other tort, so their claim did not meet the exception in K.S.A. 59-2239(2). 288 Kan. at 592, 594. The children then argued the nonclaim statute did not apply, because they were not bringing a claim against assets in the estate and the action would not reduce the estate. The *Nelson* court concluded, however, that the children should have brought their breach of contract claim against their father's estate. Because they did not do so within the time limits set out in the nonclaim statute, they could not now seek an equitable remedy. 288 Kan. at 596-98.

Appellants claim the *Nelson* court held that a party cannot bring a constructive fraud claim after the running of the nonclaim statute if the party could have brought the claim as a breach of contract claim. This reading of *Nelson* conflates constructive fraud with constructive trust. In contrast, the *Nelson* court distinguished between constructive fraud and constructive trust, and then held that a party cannot request a constructive trust for a breach of contract claim after the running of the nonclaim statute. 288 Kan. at 590-92. The court noted that an allegation of fraud or any other tort would have met the exception to the nonclaim statute, but the children had not pled actual or constructive fraud. 288 Kan. at 592.

14

Appellants also cite to *Draper*, claiming the *Draper* court held the nonclaim statute bars any claim related to an agreement, regardless of whether the claim sounds in contract or tort. The *Draper* court was addressing a different issue, though. It was determining whether an estate could bring a cause of action when another party could have brought that same cause of action but failed to do so within the nonclaim statute. As part of its analysis, the court acknowledged that there were third-party beneficiaries in the case who arguably had a breach of contract claim against the estate. Citing *Nelson,* the court stated that if those third-party beneficiaries sought to enforce a contract made by the decedent, that claim would be against the estate and subject to the nonclaim statute. 288 Kan. at 529-30. The *Draper* court went on to hold, however, that an estate has a duty to marshal assets. Because of this duty, an estate may appropriately bring those claims necessary to recover assets which should be in the estate. 288 Kan. at 529-33.

Appellants also misinterpret the holding in *Salvation Army* as applied to this case. In *Salvation Army*, this court held a remainderman may bring a claim to recover the remainder of a life estate if certain conditions are met and the nonclaim statute does not bar such a claim. 1 Kan. App. 2d at 606. Appellants correctly assert that the *Salvation Army* exception does not apply in the present case. They fail to mention, however, *Salvation Army* also held that constructive fraud claims are not subject to the nonclaim statute. 1 Kan. App. 2d at 601.

Appellants cite to a number of other Kansas cases they claim support their argument. Again, none of them do so. In *In re Estate of Goodburn*, 210 Kan. 740, 746, 504 P.2d 612 (1972), the court held that an attempt to enforce a contractual will constitutes a demand against the estate and not a will contest. It said nothing about constructive fraud claims and the nonclaim statute. In *In re Estate of Pallister,* 13 Kan. App. 2d 337, 339, 770 P.2d 494 (1989), the court held that an attempt to enforce a contractual will was a claim against the estate and subject to the nonclaim statute. The court did not address the subject of constructive fraud and the nonclaim statute but noted there had been no fraud in that particular case that could form the basis of a constructive

15

trust. 13 Kan. App. 2d at 340. In *Salvation Army*, the court held that in the absence of proof of fraud, a breach of contract claim against an estate is subject to the nonclaim statute and the district court had erred in imposing a constructive trust on a contract claim brought after the running of the nonclaim statute. 1 Kan. App. 2d at 601.

Appellants also cite to other jurisdictions, but these cases do not help them either. In *Matter of Estate of Levine*, 145 Ariz. 185, 188, 700 P.2d 883 (Ct. App. 1985), an Arizona appellate court held that the Arizona nonclaim statute applied to a request for a constructive trust based on a breach of contract claim against a decedent's estate. The case did not deal with constructive fraud. Furthermore, unlike the Kansas nonclaim statute, the Arizona nonclaim statute does not have an exception for tort claims. A.R.S. § 14-3803.

In *Wilkison v. Wiederkehr*, 101 Cal. App. 4th 822, 834-35, Cal. Rptr. 2d 631 (2002), a California appellate court held the district court erred in granting quasi-specific performance of an agreement when the party had an adequate remedy by way of damages for breach of contract. Again, this case does not address constructive fraud. The case appears to hold constructive trusts are not an available remedy for breach of contract claims. See 101 Cal. App. 4th at 834. This runs counter to Kansas caselaw, which allows constructive trusts for breach of contract claims. See *Nelson*, 288 Kan. at 584-90.

Furthermore, Appellants' argument runs counter to established Kansas caselaw. Precedent establishes that constructive fraud claims may be based on a breach of contract as long as the evidence establishes the elements of constructive fraud. For example, in *Garrett v. Read*, 278 Kan. 662, 102 P.3d 436 (2004), *disapproved of on other grounds by Nelson*, 288 Kan. 570, a husband and wife, who both had children from previous marriages, executed identical wills leaving their entire estate to the surviving spouse and then to the children. After the husband died and the entire estate passed to his wife, she revoked her previous will and executed a new one, leaving the estate to her children and effectively disinheriting her husband's children.

At the time of the wife's death, her previous will was no longer in effect. Her husband's children brought a claim for constructive fraud, arguing her original will was contractual and the couple had an agreement regarding the disposition of property after death. The *Garrett* court found the couple had a confidential relationship because they were spouses and they had an agreement regarding how the surviving spouse would distribute the property of the other upon his or her death. 278 Kan. at 674. The wife committed constructive fraud by disposing of the estate in a way contrary to the terms of their agreement as laid out in her original contractual will. 278 Kan. at 674-75.

In *Garrett*, a party succeeded on a constructive fraud claim involving a breach of contract. Similarly, Appellee is alleging constructive fraud based on a factual scenario involving a breach of contract. Since she has pled the elements of constructive fraud, her claim is not simply a breach of contract claim and not subject to the nonclaim statute.

As another counterargument, Appellee asserts her claim for constructive fraud involving a breach of contract is permissible under Kansas law because "'when conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies.'" *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 414, 77 P.3d 130 (2003). According to Appellee, fraud is an independent tort, so she can bring the claim. Appellants counter that Appellee has failed to allege an independent tort. According to them, Appellee's claim rests only on Cap's breach of an agreement and she does not assert the breach of a separate duty.

Constructive fraud, however, does require the breach of a duty not bargained for as part of a contract. An element of constructive fraud is the breach of a legal or equitable duty imposed because of the nature of the parties' confidential relationship. See *Draper*, 288 Kan. at 519; see also 37 Am. Jur. 2d, Fraud and Deceit § 9. Appellee pled she had a confidential relationship and Cap had violated the trust she placed in him by breaching

17

their agreement. See *Kampschroeder*, 20 Kan. App. 2d at 366 (finding constructive fraud when decedent "placed trust and confidence" in surviving spouse to properly distribute assets and surviving spouse failed to do so). Therefore, Appellee's constructive fraud claim is an independent tort.

Appellants next argue the district court erred in finding Appellee and Cap had a confidential relationship. They argue the couple did not have an agreement and the evidence demonstrated that Cap had merely expressed his wishes. They also argue an agreement between spouses does not necessarily give rise to a confidential relationship.

Appellee argues substantial competent evidence supports the district court's finding that she and Cap had an agreement regarding distribution of their property after death. She further contends Kansas caselaw establishes that an agreement between a married couple regarding distribution of property after death establishes a confidential relationship.

The Kansas Supreme Court defined a confidential relationship as

"any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party. For purposes of constructive fraud, the mere relationship between parent and child or between spouses does not raise a presumption of a confidential and fiduciary relationship. However, a confidential relationship can be based on an agreement between the owner of property and another who will distribute the owner's property in a specified manner upon the owner's death. [Citations omitted.]" *Draper*, 288 Kan. at 519-20.

Whether a confidential relationship existed is a question of fact, and we review such findings for substantial competent evidence. *Logan v. Logan*, 23 Kan. App. 2d 920, 923, 937 P.2d 967 (1997). Additionally, clear and convincing evidence is the standard for proving fraud. *Nelson*, 288 Kan. at 588. An appellate court reviewing a determination

which is required to be based upon clear and convincing evidence considers whether, after review of all the evidence viewed in the light most favorable to the prevailing party, it is convinced that a rational factfinder could have found the determination to be highly probable. In reviewing the factual findings, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010) (citing *In re B.D.-Y.*, 286 Kan. 686, 697, 705, 187 P.3d 594 [2008]).

Substantial competent evidence supports the district court's finding that Appellee and Cap had a confidential relationship. Appellee testified she and Cap had been married for 10 years and had discussed the disposition of their property after death multiple times before and during their marriage. She stated they had agreed that if one of them should pass away, the entire estate should go to the surviving spouse, and if both of them should pass away, the estate should be liquidated and divided equally among their four children. Dawn and Casey also recalled having conversations with Appellee and Cap in which the couple stated these terms of agreement. Henry testified that Cap told him he wanted his entire estate to go to his wife. Appellants testified Cap had never mentioned an agreement, but he had told them he wanted things to go "like we talked about." According to Spencer, this comment appeared to be directed at Appellee. Viewing the evidence in the light most favorable to Appellee, she established the existence of a confidential relationship.

Appellants argue the evidence only shows that Cap had expressed his wishes about what should happen to his property after his death. They point to Henry's testimony that he could not draft a will based on what Cap had told him. This is not the only evidence of an agreement, though. Appellee, Dawn, and Casey all testified to a specific agreement about the disposition of the couple's property after the death of one or both spouses. Appellants do not challenge this finding on any other ground.

19

Appellants also argue that Appellee's alleged agreement cannot be the basis of a confidential relationship. As the *Draper* court noted, however, "Kansas has repeatedly recognized a confidential relationship arises when spouses agree to leave property by will." 288 Kan. at 521. For example, in *Kampschroeder v. Kampschroeder*, 20 Kan. App. 2d 361, 887 P.2d 1152 (1995), a husband and wife each had a child from a previous marriage, and they both brought property into the marriage which they intended to pass to their respective children. When the husband died, however, the couple held most of their property in joint tenancy. The wife then transferred the property to her child. Even in the absence of a written will, the district court found the evidence demonstrated the couple had an agreement that the surviving spouse would enjoy the property but then pass it on to the decedent's child, and the wife had acted contrary to this agreement.

On review, the Court of Appeals affirmed the district court's conclusion that there had been constructive fraud. 20 Kan. App. 2d at 364. As for the confidential relationship, the *Kampschroeder* court noted the evidence demonstrated that the couple made an agreement that the surviving spouse would properly distribute any assets. The husband had "placed trust and confidence" in the surviving wife to properly distribute the property, and "it would be inequitable to permit her to disregard the terms of that agreement." 20 Kan. App. 2d at 366.

Similar to *Kampschroeder*, evidence demonstrated that Appellee and Cap had an agreement regarding the distribution of their property after one or both of them passed, even though that agreement was never reduced to writing. See also *Garrett*, 278 Kan. at 674-75 (finding confidential relationship existed between spouses who made contractual wills). As such, precedent clearly establishes that an agreement between Appellee and Cap regarding distribution of property after death could give rise to a confidential relationship.

*Conclusion*

Based on both Kansas statutes and caselaw, Appellee's constructive fraud claim was not subject to the nonclaim statute. Kansas precedent also establishes that Appellee could base her constructive fraud claim on a fact scenario involving a breach of contract. Substantial competent evidence supported the district court's finding that Appellee and Cap had a confidential relationship. Under Kansas law, an agreement between spouses regarding the disposition of property after death gives rise to a confidential relationship. Accordingly, we affirm the district court's order.

Affirmed.